UNITED STATES of America,
Plaintiff-Appellee,

v.

Alen Terry WHITE, Defendant-Appellant.

No. 76–1391.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 7, 1977.

Decided Aug. 12, 1977.*

Rehearing and Rehearing En Banc
Denied Sept. 14, 1977.

Julius Lucius Echeles, Chicago, Ill., for defendant-appellant.

Donald B. Mackay, U. S. Atty., Springfield, Ill., for plaintiff-appellee.

---

* This case was originally decided by an unpublished order. The Court has decided to publish, in the form of this per curiam opinion, certain portions of that order. The rest of the order remains subject to Circuit Rule 35.

Before CUMMINGS, PELL and TONE, Circuit Judges.

PER CURIAM.

White was indicted and convicted on one count charging conspiracy with eight named unindicted persons to distribute d, 1-amphetamine, "a Schedule II controlled substance," in violation of 21 U.S.C. § 846 and on three counts charging distribution of d, 1-amphetamine in violation of 21 U.S.C. § 841(a)(1). Numerous arguments are made on appeal.

White insists that the proof in the case was insufficient as to all counts because there was no evidence that the substances he distributed were controlled substances within the meaning of the pertinent statutory and regulatory authorities. The record contains abundant evidence that White distributed d, 1-amphetamine sulfate, and the district court instructed the jury on the point as follows: "You are instructed as a matter of law that amphetamine, its salts, optical isomers, or salts of its optical isomers, is a controlled substance as defined in Section 812, Title 21, United States Code." White does not attack the sufficiency of the evidence to support the jury's conclusion that he distributed a controlled substance as thus defined, but argues instead that this definition is inadequate, that the Government must also prove in amphetamine cases that the drug in question has a stimulant effect on the central nervous system, and that the record contains absolutely no evidence of the stimulant effect of the substances he distributed.[1] The Government concedes that no such proof was offered in the case.

The Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.,* established a variety of regulatory and criminal provisions dealing with "controlled substances," including the pro-

hibitions White is convicted of violating. Controlled substances are divided into five categories, or schedules, based on application of factors such as the degree of abuse potential, the existence of accepted medical uses, the possibility of safe uses, and the likelihood that abuse may lead to physical or psychological dependence. 21 U.S.C. § 812(b). Congress provided in the Act initial schedules, 21 U.S.C. § 812(c), which the Attorney General is required to update and republish periodically, 21 U.S.C. § 812(a), and the Attorney General is expressly authorized to add or remove substances from the controlled lists, and to move substances from one schedule to another, all pursuant to specified procedures and based on the above-mentioned factors, 21 U.S.C. § 811.

In the initial schedules incorporated into the Act, 21 U.S.C. § 812, Congress classified amphetamines as Schedule III substances:

(c) Schedules I, II, III, IV and V shall, unless and until amended pursuant to section 811 of this title, consist of the following drugs or other substances, by whatever official name, common or usual name, chemical name, or brand name designated:

\* \* \* \* \* \*

SCHEDULE III

(a) Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation *which contains any quantity of the following substances having a stimulant effect on the central nervous system:*

(1) Amphetamine, its salts, optical isomers, and sales of its optical isomers. [Emphasis supplied.]

\* \* \* \* \* \*

Subsequent to the enactment of the Act, the Attorney General rescheduled amphetamines as Schedule II substances. The

---

1. If White is right on these points, his conviction obviously must be reversed. If he is wrong, however, his two objections to the Government's closing argument (that the prosecutor referred to the "stimulant effect" argument as being "technical," for which the prosecutor promptly apologized, conceding, to avoid

error, that it was an element of the case; that the prosecutor mistakenly attributed to a Government chemist the testimony that White's drugs were "stimulants") would be, at the worst, harmless error. Accordingly, we give no independent consideration to the closing argument objections.

schedule in force at the times germane to the instant case provides, in pertinent part:

### SCHEDULE II

(a) Schedule II shall consist of the drugs and other substances, by whatever official name, common or usual name, chemical name, or brand name designated, listed in this section. . . .

   \*     \*     \*     \*     \*     \*

(d) *Stimulants.* [Emphasis in original.] Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation *which contains any quantity of the following substances having a stimulant effect on the central nervous system:*

(1) Amphetamine, its salts, optical isomers, and salts of its optical isomers. . . . [Emphasis added.]

21 C.F.R. § 1308.12 (1975), promulgated June 20, 1974. Seizing on the quoted language to which emphasis has been added, White urges us to hold that amphetamines may not be found in any trial to constitute a controlled substance unless it is proved beyond a reasonable doubt that the amphetamines in question have a stimulant effect on the central nervous system. We decline the invitation, for Congress and the Attorney General have already made that determination.

While we can agree with White that the merely denunciatory import of the "having a stimulant effect . . ." language could have been made clearer by more careful draftsmanship, we disagree that there is any reasonable doubt that such was the plain and intended meaning. The words themselves, naturally read, suggest that Congress (and later the Attorney General) determined that the listed substances *have* a stimulant effect. This determination, as to amphetamines at least, is perfectly in accord with medical fact. Dorland's Illustrated Medical Dictionary 70 (24th ed. 1965) (defining "amphetamine" and "amphetamine sulfate"). No doubt Congress can, for penal or regulatory purposes, use a word differently than its commonly accepted medical meaning would suggest, but we find absolutely no indica-

tions that such was intended here. Indeed, that "[a]mphetamines and derivatives thereof are central nervous system stimulants," S.Rep. No. 337, 89th Cong., 1st Sess., 1 U.S.Code Cong. & Ad.News 1895, 1898 (1965), was expressly recognized in the legislative history of the predecessor statute, and the legislative history of the 1970 Act, while silent on this specific point, surely gives no hint that Congress had decided, for the first time, to ignore medical reality in dealing with amphetamines.

An examination of other provisions of the 1970 Act strongly supports our conclusion. In 21 U.S.C. § 812(c), as has been noted, Congress provided initial controlled substance schedules dealing with many drugs or substances. Although certain of the substances scheduled have quantitative concentration levels prescribed and others refer to such concepts as chemical equivalents, every substance listed appears generically, and in none is anything other than chemical identity (or quantity or equivalence) required to establish a substance as controlled. The entire statutory scheme makes it clear that the effects of any substance are considered fully in making the control and scheduling decisions on that substance, and those decisions, in turn, are reviewable only directly in the courts of appeals in the normal administrative review pattern. 21 U.S.C. § 877. To accept White's argument would require us to say that for some unexplained and inexplicable reason Congress (and the Attorney General) chose to treat amphetamines differently and, indeed, inconsistently from every other controlled substance by requiring proof in each proceeding to enforce the Act with reference to amphetamines of one of the factors that had earlier been fully considered in scheduling. We do not ascribe such illogic to the Congress.

Another important indication that the "having a stimulant effect . . ." language is merely denunciatory appears in the definitions section of the Act. 21 U.S.C. § 802(9) provides:

The term "depressant or stimulant substance" means—

(A) a drug which contains any quantity of (i) barbituric acid or any of the salts of barbituric acid; or (ii) any derivative of barbituric acid which has been designated by the Secretary as habit forming under section 352(d) of this title; or

(B) a drug which contains any quantity of (i) amphetamine or any of its optical isomers; (ii) any salt of amphetamine or any salt of an optical isomer of amphetamine; or (iii) any substance which the Attorney General, after investigation, has found to be, and by regulation designated as, habit forming because of its stimulant effect on the central nervous system; or

(C) lysergic acid diethylamide; or

(D) any drug which contains any quantity of a substance which the Attorney General, after investigation, has found to have, and by regulation designated as having, a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect.

This is, of course, not a scheduling provision; "depressant or stimulant substance" is a term of art designed for use in various provisions of the Act. Nonetheless, we think that § 802(9) provides insight into Congress' acceptance of the reality of amphetamine's stimulant effect. Subsection (A) describes depressant substances just as obviously as subsection (B) describes three types of stimulant substances; subsection (C) adds an hallucinogen to the term of art, and subsection (D), to allow the Attorney General later to add like substances to the term of art, accounts for each of the types of substances listed in (A), (B), and (C) by referring to "depressant," "stimulant," and "hallucinogenic" effects.

Accordingly, we think it obvious that Congress put amphetamines in the initial control schedule after having determined that they had stimulant effects on the central nervous system. It would require an overactive imagination to suppose that the Attorney General, in rescheduling amphetamines, describing them in virtually identical language to that used by Congress, somehow cut back on that determination. In-

stead, the only significant change in descriptive language was that the Attorney General's schedule expressly added the heading "*Stimulants*" to the wording covering the drug White distributed, which hardly supports White's argument. There was simply no requirement that the Government prove a stimulant effect to the jury.

 White's related assertion that if the statute and scheduling regulation are susceptible of this interpretation, then they are unconstitutionally vague, deserves no independent consideration, for it is based on the faulty premise that the statute must therefore be susceptible of various interpretations. There is only one meaning that the statute and regulation can be given, and the jury—properly instructed on that meaning—found White guilty beyond a reasonable doubt.

For the reasons herein stated the judgment of conviction appealed from is

AFFIRMED.