The STATE of Ohio, Appellee,

v.

UNDERDOWN, Appellant.

[Cite as *State v. Underdown* (1997), 124 Ohio App.3d 675.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APA02–264.

Decided Nov. 20, 1997.

*Ronald J. O'Brien,* Franklin County Prosecuting Attorney, and *Joyce S. Anderson,* Assistant Prosecuting Attorney, for appellee.

*Judith M. Stevenson,* Franklin County Public Defender, and *Paul Skendelas,* Assistant Public Defender, for appellant.

STRAUSBAUGH, Judge.

Defendant-appellant, Anthony Eugene Underdown, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of one count of voluntary manslaughter in violation of R.C. 2903.03 in connection with the stabbing death of Paul Booth.

The events that immediately proceeded Booth's stabbing are largely uncontroverted. At approximately 8:00 p.m. on October 13, 1996, defendant and Keith Frazier decided to walk to the corner carryout and purchase some beer. As they left defendant's house to head to the carryout, Paul Booth pulled up behind them in his car. Booth offered to drive defendant and Frazier to the carryout. Although neither defendant nor Frazier knew Booth well, they accepted the ride. Upon arriving at the carryout, defendant, Frazier, and Booth were joined by Terry Allen. While defendant and Frazier each purchased a forty-ounce bottle of

beer, Allen went across the street and bought a rock of crack cocaine. When Allen returned to the carryout, he, Frazier, and defendant started walking back toward defendant's house on foot. Booth left the carryout separately in his car, drove ahead, parked his car, and rejoined Allen, Frazier, and defendant on foot a few minutes later. As Frazier, Allen, Booth, and defendant walked toward defendant's house, Booth became aggressive and began to push and shove the others, and threatened to rob Allen. In an attempt to separate themselves from Booth, Frazier and Allen picked up their pace, leaving defendant and Booth a short distance behind them. As a result, there were no witnesses to the altercation which followed between defendant and Booth, and which, according to the state, resulted in Booth's death.

However, according to defendant, as Frazier and Allen turned a corner ahead of him and Booth, Booth reached up and knocked defendant's hat off, striking him in the head in the process. Booth then demanded defendant's beer, and when defendant hesitated to hand it over, Booth grabbed the bottle from defendant's hand. Defendant then attempted to walk quickly away from Booth and to catch up with Frazier and Allen. As he did so, Booth reached out and grabbed defendant from behind. Defendant turned quickly around in an attempt to free himself from Booth's grasp, and removed a folding knife he was carrying from his jacket pocket. Now facing Booth, defendant backed away from him, opening the knife as he did so. According to defendant, Booth then came at him with the beer bottle, tripped over the curb and fell into defendant, impaling himself on the knife that defendant was holding and causing both men to fall to the ground. When the two men got back on their feet, Booth fled down the street and defendant rejoined Frazier and Allen in front of his house. Defendant testified that he did not realize that Booth was badly hurt. However, the autopsy that was later performed on Booth revealed that in addition to the lethal wound by a knife that entered the upper abdomen and pierced the liver and aorta, Booth had three other nonlethal stab wounds: one to the right side of his neck, one to his right front shoulder, and one to his right rear shoulder.

Shortly after defendant rejoined Frazier and Allen, Allen complained that he was cold, and borrowed defendant's jacket. Allen testified that there was nothing in the pockets of defendant's jacket when he borrowed it. However, defendant testified that his knife was in the jacket when he loaned it to Allen. Frazier, Allen, and defendant then went around to the back of defendant's house to drink beer and smoke crack. Allen testified that he left defendant's house about twenty minutes later still wearing defendant's jacket. The police never recovered defendant's knife.

At approximately 12:30 a.m. on October 14, 1996, a Columbus Police Officer discovered Booth, still alive, lying in the middle of a street in the vicinity of the stabbing. Booth died several hours later at the hospital.

Around 4:00 a.m. on October 14, 1996, Allen was stopped by Columbus Police for riding his bicycle without a light. Following a records check, Allen was arrested on an outstanding warrant. While Allen was being transported to jail he overheard a bulletin on the police radio stating that Paul Booth had died at the hospital. Allen then volunteered the information that he had about the altercation between Booth and defendant.

While questioning Allen about the events that led to Booth's death, the police inquired about the fact that someone had attempted to use two of Booth's credit cards in the early morning hours of October 14, 1996, following the stabbing. In response, Allen stated that after he left defendant's house he happened upon Booth's car, which was still parked where Booth had left it earlier that night. According to Allen, when he looked into the car, he noticed a credit card sitting on the dashboard and took it. Later he tried to use the card to purchase gas but was unsuccessful, so he cut the card up and discarded it. Allen stated that he had no knowledge of the second stolen credit card. Allen repeated this story at defendant's trial.

Based upon Allen's statements to police, defendant was arrested and charged with one count of murder in violation of R.C. 2903.02. Beginning on January 8, 1997, defendant was tried before a jury for Booth's murder. During the trial, defendant testified in his own defense. On January 17, 1997, the jury returned a verdict finding defendant not guilty of murder, but guilty of the lesser included offense of voluntary manslaughter. The court then entered a judgment sentencing defendant to nine years of incarceration. Defendant appeals therefrom assigning the following errors:

### "FIRST ASSIGNMENT OF ERROR

"Appellant was denied effective assistance of counsel as guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

### "SECOND ASSIGNMENT OF ERROR

"Appellant was denied his right to a fair trial as a result of prosecutorial misconduct.

### "THIRD ASSIGNMENT OF ERROR

"Evidentiary errors made by the trial court denied Appellant a fair trial.

## "FOURTH ASSIGNMENT OF ERROR

"The jury erred in failing to find that self defense was established by a preponderance of the evidence."

In his first assignment of error, defendant contends that his counsel's performance was so deficient as to deny him the effective assistance of counsel guaranteed to criminal defendants by the Sixth Amendment to the United States Constitution, and Section 10, Article I, of the Ohio Constitution.

In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged standard outlined in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, he must demonstrate that his counsel's performance was deficient and that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Second, defendant must demonstrate that he was prejudiced by his counsel's errors, showing that the "errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* To meet this second prong, defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

Although defendant has pointed out numerous alleged errors by his defense counsel, we will focus on four related and particularly troubling actions by defense counsel. However, a complete appreciation of the errors committed by defense counsel necessitates a brief discussion of defendant's explanation of the events which led to Booth's death.

While defendant's explanation of Booth's stabbing as an accident accounts for only one of Booth's four knife wounds, during his videotaped statement to police, defendant suggested an alternative and potentially plausible, albeit unlikely, explanation for Booth's additional wounds. Specifically, defendant suggested that Booth's three additional wounds were inflicted by Allen. Defendant suggested that Allen, after leaving defendant's house wearing defendant's jacket with defendant's knife in the pocket, found Booth lying in the street wounded by the single accidental stab, took the knife from the pocket of defendant's jacket, stabbed Booth three additional times and stole his credit cards. Allen then attempted to use Booth's credit cards numerous times over the next several hours.

We now turn to addressing defendant's claim of ineffective assistance of counsel. Counsel's first, and most egregious error, occurred shortly after defendant's arrest. With counsel's advice and consent, defendant agreed to give a

statement to the police. Defendant's statement was given to two homicide detectives from the Columbus Police Department. The statement was video-taped and defendant's counsel was present throughout. The statement that defendant gave to police was materially consistent with his trial testimony. Specifically, defendant stated that Booth's stabbing resulted from an accident that occurred when Booth tripped over the curb and fell on defendant. However, at numerous points during defendant's statement, defense counsel referred to defendant's explanation of the events as "bullshit," looked incredulously at defendant, and urged defendant to tell the truth. In fact, defense counsel's performance during defendant's statement to police was so outrageous that counsel could easily be mistaken for a police officer at various points throughout the video. Despite defense counsel's attacks, defendant continued to maintain that the stabbing was an accident.

At defendant's trial, the videotape of defendant's statement to police was shown to the jury. Defense counsel, apparently realizing the damaging nature of the video, objected to the playing of the video. When this objection was overruled, defense requested that those portions of the tape showing defense counsel referring to defendant's story as "bullshit" be excised pursuant to Evid.R. 403(A) prior to showing the video to the jury. The trial court denied this request as well.

Defense counsel's attack on defendant's version of the facts as "bullshit" on the videotape was compounded by counsel's opening statement. Counsel began his opening statement with the following comment:

"I represent the Defendant here.

"Some of what he says is true, *and some of it is not true.* All the facts will come out." (Emphasis added.)

This statement by defense counsel served to cast serious doubt on defendant's credibility at the very beginning of the trial by suggesting that defendant's own lawyer did not believe portions of defendant's story.

Further, despite defendant's insistence that Booth's stabbing was the result of an accident, defense counsel failed to request a jury instruction on the defense of accident. Instead, defense counsel requested, and received, a jury instruction on the affirmative defense of self-defense, a defense that is patently inconsistent with defendant's explanation of the events. Defendant never gave an explanation of the stabbing that would be consistent with the affirmative defense of self-defense. At all times both prior to and during his trial, defendant maintained that Booth's stabbing resulted from an accident that occurred when Booth tripped and fell onto the knife that defendant was holding. Although defendant's testimony indicates that defendant took the knife out in preparation to defend

himself, defendant consistently maintained that the actual stabbing occurred as the result of an accident.

Finally, given the uncontroverted evidence that Allen borrowed defendant's jacket and that he stole and attempted to use one of Booth's credit cards after Booth was stabbed, defense counsel failed to adequately develop defendant's theory that Allen played a role in Booth's death and that Allen's role accounted for Booth's additional stab wounds. Although defense counsel cross-examined Allen briefly about his use of the credit cards, counsel failed in his closing remarks to tie together the evidence regarding Allen's possession of the jacket, in which defendant testified the knife was located, and Allen's possession of Booth's credit card in an attempt to suggest that Allen might have inflicted the additional stab wounds.

It is clear that defense counsel's performance meets the first prong of *Strickland*. Defense counsel had a duty to zealously represent defendant within the bounds of the law. DR 7–101(A)(1). Instead, counsel affirmatively prejudiced defendant's interest by questioning defendant's version of the facts, and defendant's credibility in the presence of the jury. DR 7–101(A)(3).[1] Defense counsel also appears to have based his request for jury instructions upon what he believed to be the best explanation of the events leading to the victim's death, rather than the explanation propounded by defendant. In short, the record suggests that defense counsel allowed his personal doubts about defendant's version of the facts to cloud his professional judgment and to interfere with his representation of defendant. Defendant presented a plausible, if unlikely, exculpatory explanation of how Booth was killed and how he came to have multiple stab wounds. However, instead of attempting to develop and build upon defendant's explanation, defense counsel cast aspersions upon it and upon defendant's credibility. In short, defense counsel's representation of defendant was far below the objectively reasonable standard of legal representation to which a criminal defendant is constitutionally entitled.

■ The question under *Strickland* then is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of defendant's trial would have been different. Because defendant was the only witness to testify regarding how Booth was stabbed, the outcome of defendant's trial turned in large part upon the extent to which the jury believed defendant's version of the events. However, the jury could not possibly have fairly evaluated defendant's

---

1. DR 7–101(A)(3) provides as follows:
   "A lawyer shall not intentionally:
   " * * *
   "(3) Prejudice or damage his client during the course of the professional relationship * * *."

credibility after hearing defendant's own attorney question defendant's truthfulness in his opening statement, and again in the videotape. It is true that the portions of the videotape containing defense counsel's improper criticism of defendant's explanation of the stabbing should have been excised pursuant to Evid.R. 403(A), as counsel's behavior was terribly prejudicial to defendant and wholly irrelevant to the state's case. See Evid.R. 403(A). The fact remains, however, that the no such redaction occurred and the jury was fully exposed to defense counsel's errors.

Further, defense counsel's failure to develop Allen's possible role in Booth's death in his closing argument prevented the jury from gaining a complete picture of defendant's version of the events.

Finally, the absence of a jury instruction on the defense of accident prevented the jury from acquitting defendant even if it believed defendant's story in its entirety.

Given the cumulative effect of defense counsel's errors, we can only conclude that there is a reasonable probability that defendant would have been acquitted but for defense counsel's unprofessional performance. Defendant's first assignment of error is sustained.

Our resolution of defendant's first assignment of error renders defendant's remaining assignments of error moot, and we decline to address them.

Having sustained defendant's first assignment of error, and having found defendant's remaining assignments of error to be moot, we reverse the judgment of the trial court and remand this matter for further proceedings in accordance herewith.

*Judgment reversed*
*and cause remanded.*

PETREE and JOHN C. YOUNG, JJ., concur.

DEAN STRAUSBAUGH, J., retired, of the Tenth Appellate District, was assigned to active duty under the authority of Section 6(C), Article IV, Ohio Constitution.