[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
{¶ 1} Defendant, Jeremy L. Chavis, appeals from a judgment of the Franklin County Common Pleas Court finding him guilty of two counts of aggravated murder with specifications. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} Defendant was indicted by the Franklin County Grand Jury on November 16, 2000, in a two-count indictment. Count one charged defendant with the aggravated murder of Shannon Hawk in violation of R.C. 2903.01. Count one contained a specification, pursuant to R.C. 2929.04(A)(3), that the offense was committed for the purpose of escaping detection, apprehension, trial or punishment for another offense. Count two charged defendant with the aggravated murder of James Reynolds in violation of R.C. 2903.01. Count two contained a specification, pursuant to R.C.2929.04(A)(8), that the victim of the aggravated murder was a witness to an offense and was purposely killed to prevent the victim's testimony in a criminal proceeding, and that the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness. Counts one and two each contained two additional specifications: (1) the offense was part of a course of conduct involving the purposeful killing of two or more persons (R.C. 2929.04[A][5]); and (2) defendant had a firearm on or about his person or under his control while committing the offense (R.C. 2941.145).
 {¶ 3} The foregoing charges related to an incident alleged to have occurred on June 26, 1996. On that date, defendant and Bobby Bethel allegedly killed Reynolds to prevent him from testifying against their friend, Tyrone Greene, in an upcoming aggravated murder trial. Hawk, Reynolds's girlfriend, was allegedly killed simply because she was with Reynolds at the time he was killed. The bodies of Hawk and Reynolds were found in a secluded field owned by defendant's grandfather on the south side of Columbus. Reynolds was shot ten times, including five shots to the head with a .9-millimeter pistol and one shot to the back with a 12-gauge shotgun. Hawk was shot four times with a .9-millimeter pistol, including two shots to the head. Twenty .9-millimeter shell casings and ten shotgun shell casings were found at the scene.
 {¶ 4} Defendant's jury trial was held in November 2001. At trial, Melissa Brown and Tracy Queen, both friends of Reynolds and Hawk, and Reynolds's brother, Michael Reynolds, all testified that they last saw Reynolds and Hawk alive on the afternoon/early evening of June 25, 1996. All three further stated that Reynolds and Hawk told them they were going with defendant and Bethel to shoot guns in a field on the south side of Columbus.
 {¶ 5} Robert Krapenc, a Franklin County Assistant Prosecutor, testified that he was the lead prosecutor in the aggravated murder case against Tyrone Greene. According to Krapenc, discovery provided to Greene's defense counsel by the prosecution in that case revealed that Reynolds was the only eyewitness to a murder committed by Greene and was to testify to that effect at Greene's trial; however, Reynolds was murdered before the case went to trial. After Reynolds was murdered, Greene pled guilty to a lesser included offense of aggravated murder. The parties stipulated that defendant's fingerprints were found on the aforementioned discovery documents.
 {¶ 6} Daniel F. Ozbolt, a special agent for the United States Treasury Department, Bureau of Alcohol, Tobacco and Firearms ("ATF"), testified that he specializes in the investigation of narcotics trafficking and homicides committed by gang members. He became involved in the investigation of the murders in July 2000. According to Agent Ozbolt, defendant and Bethel had been identified as suspects in the murder prior to his involvement in the investigation. As part of his investigation, Agent Ozbolt contacted Donald Langbein, a member of the Crips street gang. Langbein agreed to provide information about the murders in exchange for a lesser sentence on federal firearms charges to which he had pled guilty.
 {¶ 7} Agent Ozbolt also testified that on June 13, 1996, Bethel and defendant's brother, Cheveldes Chavis, each purchased a Maverick 12-gauge shotgun, Model 88. Mark Hardy, a criminalist with the Columbus Division of Police, testified that the shotgun purchased by Chavis fired three of the ten shotgun shell casings recovered from the scene of the murders. That shotgun was later recovered at Bethel's home. Hardy further testified that the remaining shotgun casings recovered from the scene had similar class characteristics and could have been fired from the type of shotgun purchased by Bethel. According to Agent Ozbolt, that shotgun was never recovered. In addition, no .9-millimeter weapon was ever found.
 {¶ 8} A conversation taped on August 27, 2000, between defendant and Chavis was played for the jury. On the tape, defendant asked Chavis about "dirty toys." (Tr. Vol. II, 245-246), and Chavis indicated that he "gave up on that." (Tr. Vol. II, 247.) Agent Ozbolt testified that the phrase "dirty toys" was slang for weapons that had been used in the commission of a crime.
 {¶ 9} Agent Ozbolt identified several photographs of defendant standing alongside either Bethel or Langbein. In the photographs, defendant was wearing a blue bandana over part of his face and was making certain gestures with his hands. When questioned about the significance of the blue bandana and the hand gestures, Agent Ozbolt testified that members of the Crips street gang often wear or carry blue bandanas and make similar hand gestures. Agent Ozbolt also identified a photograph of defendant that was discovered in Greene's prison locker. The photograph had been sent from Chavis to Greene and depicted defendant wearing a blue bandana on his head. The picture was inscribed on the back with the words "[y]our boy, Jeremy with his south side love on his head, summer of '96." (Tr. Vol. II, 276.)
 {¶ 10} Langbein testified that he and defendant (his cousin), along with Greene, Bethel and Reynolds, were all members of the Crips street gang. Langbein described their relationship as "close" and stated that they were generally together 24 hours a day.
 {¶ 11} Langbein further testified that he, defendant and Chavis visited Greene in jail prior to Greene's entering the guilty plea in his aggravated murder case. Greene told them that Reynolds (who at the time was in a juvenile detention facility) was going to testify against him at his trial. Thereafter, Langbein and defendant discussed what to do about Reynolds's testimony. According to Langbein, they decided to "play it by ear to see what happen[ed]" after Reynolds was released from the juvenile detention facility. (Tr. Vol. III, 31.) After Reynolds was released, he continued to "hang out" (Tr. Vol. III, 31) with defendant, Langbein and Bethel. According to Langbein, Reynolds was unaware that defendant and the others knew that he was planning to testify against Greene.
 {¶ 12} Langbein further testified that after Reynolds's funeral, defendant confessed to him that he and Bethel shot and killed Reynolds and Hawk using a .9-millimeter pistol and a shotgun. According to Langbein, defendant also told him that the day after the murders, he and Bethel burned all their clothes, took apart the guns, and threw them into an unknown body of water. Langbein further testified that the shotgun used in the murders had been purchased by Bethel and Chavis a few weeks before the murders. He further attested that subsequent to the murders, defendant and Bethel both told him that they were having nightmares about what had happened.
 {¶ 13} Chavis testified that he and Bethel each purchased a shotgun shortly before the murders. He also testified that he told the police in November 2000 that defendant admitted to him that Bethel shot Reynolds and Hawk with a .9-millimeter weapon, that defendant reloaded the weapon for Bethel at least three times during the course of the murders, that defendant fired the shotgun, and that defendant told him and Langbein that he and Bethel later threw their guns into an unknown body of water. He further testified that defendant obtained the discovery documents in the Tyrone Greene murder case prior to the time Reynolds and Hawk were murdered.
 {¶ 14} Ted Palladeno testified that he and defendant were in jail together after Reynolds and Hawk were murdered. According to Palladeno, defendant confessed that he shot Reynolds in the back and later got rid of the gun.
 {¶ 15} Gina Locklear, David Griffith and Judith Griffith testified on behalf of defendant. Locklear, a friend of defendant, stated that at approximately 4:30 p.m. on June 25, 1996, she observed Reynolds and a man named Joey Green arguing in a grassy area near Fourth Street on the south side of Columbus. Defendant, Bethel and Reynolds's brothers Michael and Mark were also in the area. Locklear remained at the scene of the argument for approximately five minutes. She further testified that she spoke to defendant at Reynolds's funeral and that he appeared to be "upset" and "angry." (Vol. III, 191-192.)
 {¶ 16} Judith Griffith, defendant's aunt, and her husband, David Griffith, testified that defendant lived with them on June 25, 1996. Both testified that defendant returned home at approximately 10:00 p.m. on June 25, 1996. Both indicated that they were unaware that defendant had apparently told the police that he did not get home until 11:15 p.m. on June 25, 1996.
 {¶ 17} On November 27, 2001, the jury returned guilty verdicts on both counts of the indictment, including all specifications. The trial court sentenced defendant to 30 years to life imprisonment on each count, to be served consecutively. Defendant received an additional three years' imprisonment for the firearm specification.
 {¶ 18} Defendant has timely appealed and advances the following three errors for our review:
 {¶ 19} "[1.] Whether the court erred to the substantial prejudice of the defendant by permitting irrelevant evidence but highly prejudicial testimony regarding gang affiliation to be introduced at trial?
 {¶ 20} "[2.] Whether the court erred to the substantial prejudice of the defendant when it permitted the state to impeach its own witness in violation of Rule 607(A) of the Ohio Rules of Evidence?
 {¶ 21} "[3.] The trial court erred to the substantial prejudice of the defendant-appellant by permitting the guilty verdict when defendant-appellant did not have the effective assistance of counsel at trial."
 {¶ 22} By the first assignment of error, defendant urges that the trial court improperly admitted evidence regarding defendant's alleged affiliation with the Crips street gang. It is defendant's contention that testimony offered by Agent Ozbolt and Langbein during the state's case-in-chief as to defendant's alleged gang membership was irrelevant under Evid.R. 401 and should have been excluded under Evid.R. 402. Defendant further contends that even if the evidence of gang affiliation was relevant, it was inadmissible because its probative value was substantially outweighed by the danger of unfair prejudice. Finally, defendant argues that the evidence of gang membership constituted "bad" character evidence proscribed by Evid.R. 404(A) because it was offered for the purpose of proving that he acted in conformity therewith.
 {¶ 23} Initially, we note that defendant concedes that no objection was made to the challenged evidence, but maintains that the admission of such evidence constitutes "plain error." In general, a reviewing court will not consider any alleged error that was not brought to the attention of the trial court at the time the alleged error is said to have occurred. State v. Slagle (1992), 65 Ohio St.3d 597, 604. A reviewing court may consider a trial error that was not objected to only when such error constitutes "plain error." Id. "Plain error is an obvious error * * * that affects a substantial right." State v. Yarbrough (2002), 95 Ohio St.3d 227, 244, quoting State v. Keith (1997),79 Ohio St.3d 514, 518. An alleged error constitutes plain error only if the error is "obvious" and, but for the error, the outcome of the trial clearly would have been different. Id. at 244-245. A reviewing court must examine the asserted error in light of all the evidence properly admitted at trial to determine whether the jury would have convicted the defendant had the alleged error not occurred. Slagle at 605. "[N]otice of plain error is taken with utmost caution only under exceptional circumstances and only when necessary to prevent a manifest miscarriage of justice." State v. Martin, Franklin App. No. 02AP-33, 2002-Ohio-4769, at ¶ 28, quoting State v. Hairston (Sept. 28, 2001), Franklin App. No. 01AP-252, and State v. Lumpkin (Feb. 25, 1990), Franklin App. No. 91AP-567.
 {¶ 24} Pursuant to Evid.R. 402, evidence that is not relevant is not admissible. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Defendant contends that the gang evidence was not relevant because it did not have the tendency to make the existence of any fact that was of consequence to the determination of the action any more or less probable than it would have been without the evidence. Specifically, defendant contends that other evidence clearly demonstrated what the gang affiliation evidence was offered to establish; that is, that defendant and Bethel were close friends; that both were close friends of Greene; and that defendant (and Bethel) murdered Reynolds to prevent him from testifying against their friend Greene. According to defendant, the testimony regarding defendant's alleged gang membership thus had no probative value.
 {¶ 25} Under the circumstances of this case, we agree with defendant's contention that the gang affiliation evidence was not relevant, as it did not have any tendency to make the existence of any fact that was of consequence to the determination of the action more or less probable than it would have been without the evidence. As argued by defendant, evidence other than that tying defendant to the Crips street gang clearly established that defendant and Bethel were friends and that both were close friends of Greene. Since the state's theory of the case was that the murders were committed by defendant and Bethel to keep Reynolds from testifying against their friend Greene, and since it had been established that the three were close friends, the gang affiliation evidence was of no import.
 {¶ 26} The state contends that the gang evidence was relevant under Evid.R. 404(B) to demonstrate both motive and common purpose. Specifically, the state contends that evidence of gang affiliation was relevant to establish that defendant and Bethel committed the murders out of a "deep and jaded sense" of loyalty and alliance to fellow gang member Greene. However, the record contains neither general evidence that gang members are extremely loyal or allied to one another nor, more importantly, specific evidence that the motive and/or common purpose for the murders was gang loyalty and/or alliance.
 {¶ 27} Further, even if admission of evidence linking defendant to a gang was error, such admission was not prejudicial to defendant. As noted previously, Langbein testified that defendant confessed to him that he and Bethel shot and killed both Reynolds and Hawk with a .9-millimeter pistol and a shotgun. Chavis testified that he told police in November 2000 that defendant admitted to him that Bethel shot Reynolds and Hawk with a .9-millimeter weapon, that defendant reloaded the weapon for Bethel at least three times, and that defendant fired the shotgun. Both Langbein and Chavis testified that defendant also admitted to throwing at least some of the murder weapons into an unknown body of water. Palladeno also testified that defendant confessed to shooting Reynolds in the back. Given this testimony, we find that defendant has failed to demonstrate the existence of "plain error" because there is no indication that the admission of the testimony relating to gang membership adversely affected defendant's right to a fair trial or that defendant's conviction constituted a manifest miscarriage of justice. Accordingly, the first assignment of error is not well-taken.
 {¶ 28} By the second assignment of error, defendant contends that the trial court erred in permitting the state to impeach its own witness, Chavis, in violation of Evid.R. 607. Defendant argues that the trial court improperly classified Chavis as a court witness pursuant to Evid.R. 614(A). Specifically, defendant maintains that in so doing, the trial court allowed the state to cross-examine its own witness in violation of Evid.R. 607 without a demonstration of surprise and affirmative prejudice.
 {¶ 29} Evid.R. 607(A) provides:
 {¶ 30} "(A) Who may impeach
 {¶ 31} "The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid.R. 801(D)(1)(a), 801(D)(2), or 803."
 {¶ 32} Evid.R. 614(A) provides:
 {¶ 33} "(A) Calling by court
 {¶ 34} "The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called."
 {¶ 35} As stated in State v. Dacons (1982), 5 Ohio App.3d 112:
 {¶ 36} "In State v. Adams [(1980), 62 Ohio St.2d 151], upon request of the state, a witness was called as the court's witness because she had made statements in the past that were inconsistent and would be inconsistent with her expected trial testimony. The witness was called by the court who asked a short series of non-leading questions and then permitted both prosecution and defense the opportunity to cross-examine. The Supreme Court held that, under Ohio common-law rules of evidence, the prosecution, had it called the witness, would have been deemed to have vouched for her credibility and could not thereafter have impeached her. The court stated that the trial court had the power under common-law evidentiary rules to call witnesses in the exercise of sound discretion. The court rejected the argument of the defense that it would be unfair to permit the prosecution to gain the right to impeach the witness and to be able to ask leading questions of the witness. The Supreme Court found no abuse of discretion, as there was justification in that the witness' testimony would be beneficial to the jury in performing its fact-finding responsibilities.
 {¶ 37} "In this case, the state made a motion to call Cauthon as the court's witness on the basis that his trial testimony was expected to be different than pretrial statements he had given the state. Vernon Cauthon was an important eyewitness whose testimony could reasonably be found to be necessary to aid the jury in responsibly carrying out is fact-finding function. The reason the state requested the court to call Cauthon as a witness, rather than calling him as a witness itself, was to avoid being unable to test the credibility of his testimony by his prior out-of-court statement, just as in Adams." Id. at 114.
 {¶ 38} The Dacons court noted that Adams was decided prior to the effective date of the Ohio Rules of Evidence, but held that Evid.R. 607 and 614 codified the common law evidentiary rules set forth in Adams.
 {¶ 39} The record in the instant case demonstrates that the prosecutor called Chavis to testify in the state's case. Prior to his testimony, however, the prosecutor noted for the record that Chavis had originally stated that he was not going to answer the prosecutor's questions or say that defendant was involved in the murders, contrary to previous statements he had made to police. Upon further discussion, Chavis informed the prosecutor that he would be truthful in his testimony. Based upon these inconsistent statements, the prosecutor noted for the record that Chavis would be called as a state's witness; however, if the prosecutor determined that Chavis's testimony was not truthful, the prosecutor intended to ask the court to call him as a court witness.
 {¶ 40} During Chavis's direct testimony, the prosecutor, out of the presence of the jury, asked the court to call him as the court's witness so the prosecutor could interrogate him as if on cross-examination. Specifically, the prosecutor explained that he believed that Chavis's trial testimony was untruthful because it was inconsistent with statements Chavis had made to the police in November 2000. After argument by counsel, the court agreed to call Chavis as the court's witness. Thereafter, the court instructed the jury that it was calling Chavis as its own witness, that both parties would be given the opportunity to cross-examine him, and that the fact that the witness was called by the court should in no way affect the jury's consideration of the witness's credibility. As previously noted, Chavis testified that defendant confessed to the shootings and confided that he had nightmares about the incident. Defense counsel was permitted to thoroughly cross-examine Chavis about his statements to the police and the circumstances under which those statements were made. The jury was given the aforementioned cautionary instruction.
 {¶ 41} Upon review of the record, this court finds that the trial court did not abuse it discretion by calling Chavis as a court witness and permitting both sides to cross-examine him extensively pursuant to Evid.R. 614(A). As in Dacons and Adams, Chavis was an important witness whose testimony could reasonably be found to be necessary to the jury in responsibly carrying out its fact-finding duties. In addition, as in Dacons and Adams, the prosecutor requested that the trial court call Chavis as its witness, rather than calling him as a state's witness, to avoid being unable to test the credibility of his testimony by his prior out-of-court statements. Moreover, the trial court cautioned the jury not to assign any more or less credibility to Chavis's testimony on the basis that he had been called as a court witness. Thus, in accordance with Dacons and Adams, we find that the trial court did not err in calling Chavis as its witness.
 {¶ 42} Moreover, even if the trial court's decision to call Chavis as a court witness was error, such error was not prejudicial to defendant. As we have previously noted, the testimony offered by Langbein and Palledeno established that defendant admitted to committing the crimes charged in the indictment. Accordingly, the second assignment of error is not well-taken.
 {¶ 43} By the third assignment of error, defendant asserts that his defense counsel was ineffective in failing to object to evidence regarding defendant's alleged gang affiliation and in failing to cross-examine one of the state's witnesses about her prior felony conviction for forgery.
 {¶ 44} In State v. Johnson (May 30, 2000), Franklin App. No. 99AP-753, this court set forth the applicable standard for addressing a claim of ineffective assistance of counsel:
 {¶ 45} "In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-prong test enunciated in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674. Initially, defendant must show that counsel's performance was deficient. To meet that requirement, defendant must show that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment. Defendant may prove counsel's conduct was deficient by identifying acts or omissions that were not the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690.
 {¶ 46} "Next, if defendant successfully proves that counsel's assistance was ineffective, the second prong of the Strickland test requires defendant to prove prejudice in order to prevail. Id. at 692. To meet that prong, defendant must show counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable. Id. at 687. See, also, State v. Underdown (1997), 124 Ohio App.3d 675,679, 707 N.E.2d 519. A defendant meets the standard with a showing `that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id. at 694."
 {¶ 47} In our resolution of the first assignment of error, we discussed at length defendant's contentions regarding the inadmissibility of gang-related evidence. Therein, we determined that such evidence was indeed irrelevant and, thus, inadmissible. Although the failure of trial counsel to object to the introduction of inadmissible evidence can be the basis for a finding of ineffective assistance of counsel, we make no such finding under the particular circumstances of this case. As noted in our discussion of the first assignment of error, the improper admission of the gang-related evidence was not prejudicial to defendant, as other evidence clearly established that defendant was guilty of the charged crimes. Accordingly, based upon this record, we cannot find that the outcome of the trial would probably have been different had defense counsel objected to the gang-related evidence.
 {¶ 48} Similarly, we find no resulting prejudice to defendant in defense counsel's failure to attack the credibility of Tracy Queen, a state's witness, by cross-examining her about her previous felony conviction for forgery. On direct examination, Queen testified that during the afternoon of June 25, 1996, Reynolds and Hawk told her they were going out to shoot guns with Bethel and defendant. Defense counsel cross-examined Queen. During the prosecutor's re-direct examination, Queen admitted that she had been convicted of forgery in 1994. Defendant's counsel did not cross-examine her about the conviction. Defendant contends that defense counsel's failure to question Queen further about the conviction minimized the impact such information could have had on the jury's assessment of Queen's credibility. Defendant maintains, therefore, that defense counsel's failure to discuss the prior conviction constitutes ineffective assistance of counsel.
 {¶ 49} Under the circumstances of this case, we cannot agree that defense counsel's failure to more fully address Queen's prior conviction constituted ineffective assistance of counsel. As noted by the state, many of the witnesses had extensive criminal records; some included offenses of violence. Two witnesses were actually incarcerated at the time of trial. Defense counsel cross-examined these witnesses about their prior convictions, challenging their credibility and motivation for testifying. Despite their convictions, the jury apparently believed these witnesses and reasonably rejected defendant's alibi defense.
 {¶ 50} Moreover, the testimony of Melissa Brown and Michael Reynolds corroborated the substance of Queen's testimony. Both placed Bethel and defendant with Reynolds and Hawk during the afternoon and/or early evening hours of June 25, 1996, and both stated that the four of them were going out to shoot guns. Based upon the foregoing, and in light of the other evidence of defendant's guilt, we simply cannot find that had defense counsel questioned Queen about her seven-year-old forgery conviction, the outcome of the trial probably would have been different. Accordingly, the third assignment of error is not well-taken.
 {¶ 51} For the foregoing reasons, all three of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
BRYANT and BROWN, JJ., concur.