The STATE of Ohio, Appellee,

v.

SAMATAR, Appellant.

[Cite as *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–180.

Decided March 31, 2003.

312

314

316

Ron O'Brien, Franklin County Prosecuting Attorney, and Steven L. Taylor, Assistant Prosecuting Attorney, for appellee.

Carol A. Wright and Mark A. Serrott, for appellant.

PETREE, Presiding Judge.

{¶ 1} Defendant, Mahad Hassan Samatar, appeals from two judgments entered by the Franklin County Court of Common Pleas—a December 3, 2001 judgment convicting him of one count of aggravated drug possession and a January 29, 2002 judgment denying his motion for new trial. For the reasons adduced below, we affirm.

{¶ 2} A review of the record reveals that defendant was indicted on February 26, 2001, on two counts of drug possession. Count one alleged that defendant knowingly obtained, possessed, or used a Schedule I controlled substance, cathinone, in violation of R.C. 2925.11, in an amount equal to or exceeding 100 times the bulk amount as defined in R.C. 2925.01. Count two alleged that defendant knowingly obtained, possessed, or used a Schedule IV controlled substance, cathine, in violation of R.C. 2925.11, in an amount equal to or exceeding 50 times the bulk amount but less than 100 times the bulk amount as defined in R.C. 2925.01.

{¶ 3} Pursuant to defendant's written waiver of jury trial, the matter was tried to the court on August 14, 2001. Prior to the presentation of evidence, the prosecution moved to dismiss count two of the indictment. At the conclusion of the evidence, the court granted the parties' request to file post-trial briefs. After consideration of the evidence and the parties' post-trial briefs, the court issued a decision on November 30, 2001. Therein, the court found defendant guilty of count one and, pursuant to the prosecution's recommendation, entered a nolle prosequi as to count two. By judgment entry filed December 3, 2001, the court sentenced defendant to a prison term of 10 years and ordered him to pay a mandatory fine of $10,000. On December 14, 2001, defendant filed a motion for a new trial, which was denied by the court via judgment entry filed January 29, 2002. Defendant has timely appealed, advancing seven assignments of error for our review[1]:

{¶ 4} "[1.] The trial court erred and abused its discretion in failing to grant the motion for new trial. The denial of the motion for new trial denied appellant due process, the right to present a defense and the effective assistance of counsel in violation of the state and federal constitutions.

{¶ 5} "[2.] Appellant was denied the effective assistance of counsel guaranteed by the federal and state constitutions.

---

1. In his original brief, defendant set forth six assignments of error. Defendant later filed a request for leave to file a supplemental brief to include a seventh assignment of error. This court granted defendant's request by journal entry filed September 16, 2002.

{¶ 6} "[3.] To apply a statute banning knowing possession of cathinone to the possession of khat violates due process of law because it fails to give defendants fair warning of what behavior is prohibited, nor a fair opportunity to avoid criminal acts by an acquaintance with the published law.

{¶ 7} "[4.] The trial court erred in failing to grant the Crim.R. 29 motion for acquittal as the evidence was insufficient as a matter of law. Additionally, the conviction was against the manifest weight of the evidence.

{¶ 8} "[5.] The trial court erred in sentencing appellant to a mandatory minimum ten year sentence because the state failed to prove beyond a reasonable doubt that appellant possessed 100 times bulk amount [of] cathinone.

{¶ 9} "[6.] A minimum mandatory ten year sentence for possession of khat violates the Eighth and Fourteenth Amendments to the United States Constitution as well as Article I, § 9 of the Ohio Constitution.

{¶ 10} "[7.] The evidence was insufficient as a matter of law in that the state failed to prove that the quantity of cathinone allegedly possessed by appellant had a stimulant effect. Additionally, the conviction was against the manifest weight of the evidence."

{¶ 11} Columbus Police Detective Jerry Peters, a member of the Ohio Organized Crime Investigations Commission, Package Interdiction Task Force, testified[2] that on February 15, 2001, he received a call from an employee of a local Federal Express ("FedEx") facility regarding a suspicious package. The FedEx International Air Waybill ("waybill") indicated that the package was shipped from Great Britain to "John Goodman" at "84 East Morill Avenue, Apartment B, Columbus, Ohio, 43207" and contained "wiring equipment." Delivery of the package had been unsuccessful because the address was invalid. Protruding from the package were brownish-red stems of vegetation. Believing the vegetation to be khat (pronounced "cot"), Detective Peters arranged for the package to be picked up under controlled conditions.

{¶ 12} "Khat" is the popular name of the plant catha edulis, "a shrub which grows wild and as a cash crop in Kenya, Somalia, Yemen, Djibouti and other countries of Northeastern Africa." (Defendant's post-trial brief, at 4.) Khat leaves are typically chewed, a tradition deeply rooted in the social lives of persons in the Middle East and southeastern Africa. It is estimated that approximately 60 to 70 percent of Somalis in Somalia chew khat on a regular basis and/or brew it into tea and drink it.

{¶ 13} Khat contains the psychoactive chemical cathinone, a stimulant. Cathinone is listed as a Schedule I controlled substance under Ohio law. See R.C.

---

2. Detective Peters's testimony was stipulated.

3719.41, Schedule 1, (E)(2). Khat also contains the less potent stimulant, cathine, a Schedule IV controlled substance under Ohio law. See R.C. 3719.41, Schedule IV, (D)(1).

{¶ 14} At approximately 8:50 p.m. on February 15, 2001, defendant arrived at the FedEx facility and presented a napkin upon which, among other things, a shipment control number matching that on the waybill and an address, "684 East Morrill Avenue, Apartment # B, 43207," were written. Defendant signed the name "John Goodman" on the signature record and took possession of the package. Defendant was subsequently arrested for possession of a controlled substance. The package was seized and the contents submitted for analysis to the laboratory at the Ohio Bureau of Criminal Investigation ("BCI").

{¶ 15} According to Detective Peters, controlled substances are often shipped via a package delivery company such as FedEx. False names and addresses and invoices describing fictitious package contents are often used in the process. Detective Peters further testified that a bundle of fresh khat is generally sold in Columbus for $25 to $40. The price decreases to $15 per bundle as the khat ages and loses its freshness.

{¶ 16} Gregory Kiddon, a forensic scientist with over 20 years of experience at BCI, conducted a chemical analysis of the khat. According to Kiddon, the package seized from defendant contained two smaller boxes, each of which contained several small bundles of khat shoots and stems. As part of his chemical analysis, Kiddon weighed each individual bundle and took a representative sample consisting of 10 or 11 grams from each bundle. Each of the samples was chopped into small pieces and ground together. The mixture was then tested. The samples were removed from the boxes on February 16, 2001, and were frozen until the chemical analysis was performed on July 24, 2001. Pursuant to the chemical analysis, Kiddon identified the Schedule I controlled substance known as cathinone in each sample. Kiddon further testified that he found no cathine in any of the samples.

{¶ 17} Kiddon prepared a report of his findings, which was submitted as state's Exhibit 7. The report indicates that one of the boxes contained 85 leaf-wrapped bundles of shoots with a gross weight of 13,853 grams. Ten bundles were removed for testing with a net weight of 1,278.04 grams. The report further indicates that the other box contained 85 leaf-wrapped bundles of shoots with a gross weight of 14,292 grams. Ten bundles were removed for testing with a net weight of 1,351.35 grams. According to the report, all of the samples were found to contain cathinone.

{¶ 18} Defense counsel attempted to impeach Kiddon's testimony with an article issued by the United States Department of Health and Human Services, entitled "Basis For The Recommendation For Control of Cathinone Into Sched-

ule I Of The Controlled Substances Act" ("HHS report"). Kiddon acknowledged that the article was authoritative. The report expressed the opinion that 100 grams of fresh khat is estimated to contain 36 mg of cathinone and 120 mg of cathine, among many other chemicals. According to the report, within 72 hours of harvest, the naturally occurring cathinone rapidly decomposes into cathine. The report further stated that fresh khat contains 100 times more cathinone than dried khat.

{¶ 19} Kiddon acknowledged the foregoing information contained within the report. Kiddon testified that he froze the plant material until the chemical analysis could be performed because he was aware that in the cathinone-to-cathine conversion process, some of the plant's psychotropic potency was lost. When pressed about his finding that the samples he tested contained cathinone, but no cathine, Kiddon admitted that he was surprised by the results but remained firm in his conviction that his chemical analysis was correct. Specifically, Kiddon stated that he could not "find any peaks that I could identify as cathine," and rejected defense counsel's suggestion that he misidentified the cathine as cathinone.

{¶ 20} Defendant testified that he came to the United States in June 1998 from his native country of Somalia. He stated that he was familiar with the khat plant, as it was grown and chewed or used to brew tea in Somalia. Defendant further testified that it is a cultural tradition to chew khat at weddings. He further claimed that there was no stimulant effect in khat. According to defendant, khat possession is not illegal in Somalia. He further averred that he had never heard of cathinone and was unaware that khat contained cathinone.

{¶ 21} Defendant testified that the khat at issue in this case was sent to the United States by a resident of London, England, named "Abdid," for use at a Somali wedding ceremony. Abdid asked defendant to pick up the package containing khat at the airport. According to defendant, Abdid gave him the shipment control number of the package but did not tell him the name that was on the package. Upon arrival at the FedEx facility, he presented the shipment control number he had been given. When the package was brought to him, he noticed the name written on it. He signed the log with the name that was written on the package.

{¶ 22} According to defendant, the khat was harvested in Kenya and shipped to London by airplane. Defendant estimated that the khat was probably kept in Kenya for two to three days before it was shipped to England. Defendant agreed that khat is sold in the Columbus Somali community for $20 to $40 a bundle.

{¶ 23} Defendant's first, third, and fifth assignments of error are interrelated, as they raise issues addressed by the trial court in its judgment denying

defendant's motion for new trial. Accordingly, we will address these assignments of error together.

{¶ 24} Defendant raised several arguments in his motion for new trial. He first asserted that Kiddon's finding of cathinone but no cathine in the sampled khat was "scientifically impossible." (Defendant's December 14, 2001 motion for new trial, at 2.) According to defendant, such erroneous testimony constituted witness misconduct under Crim.R. 33(A)(2). Defendant further contended that defense counsel was surprised by Kiddon's "no cathine" testimony and that such surprise warranted a new trial under Crim.R. 33(A)(3). Defendant further maintained that the trial court's failure to recognize the "no cathine" anomaly in Kiddon's testimony constituted an abuse of the trial court's discretion warranting a new trial under Crim.R. 33(A)(1). Defendant further maintained that he was entitled to a new trial under Crim. R. 33(A)(4) and (5) on the following two bases: (1) that the Ohio statutes and controlled substance schedules which prohibit possession of cathinone do not provide "fair warning" to a person of ordinary intelligence that possession of khat was similarly prohibited; and (2) that the sentence imposed upon him was not applicable to the facts of the case. We will discuss each of these arguments in turn.

{¶ 25} Crim.R. 33 provides:

{¶ 26} "(A) Grounds

{¶ 27} "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

{¶ 28} "(1) Irregularity in the proceedings, or in any order of ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

{¶ 29} "(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

{¶ 30} "(3) Accident or surprise which ordinary prudence could not have guarded against;

{¶ 31} "(4) That the verdict is not sustained by sufficient evidence or is contrary to law. * * *

{¶ 32} "(5) Error of law occurring at the trial;

{¶ 33} "(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. * * *"

{¶ 34} Crim.R. 33(C) mandates that motions for new trial on grounds enumerated in Crim.R. 33(A)(2) and (3) must be sustained by affidavit.

{¶ 35} The decision to grant or deny a motion for new trial is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus. An abuse of discretion exists where the record demonstrates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Clark* (1994), 71 Ohio St.3d 466, 470, 644 N.E.2d 331. The decision to grant a motion for new trial is an extraordinary measure that should be used only when the evidence presented weighs heavily against the conviction. *State v. Otten* (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009. "It is clear from the language of Crim.R. 33 that a new trial is not to be granted unless it affirmatively appears from the record that a defendant was prejudiced by one of the grounds stated in the rule, or was thereby prevented from having a fair trial. See Crim.R. 33(E)." *Columbus v. Carroll* (Aug. 27, 1996), Franklin App. No. 96APC–01–90, 1996 WL 492979.

{¶ 36} In support of his claim that a new trial was warranted on grounds of witness misconduct, defendant submitted the affidavit of Dr. Michael Jon Kell, a chemist and medical physician. Therein, Dr. Kell stated that he was familiar with the plant chemistry of the khat plant; that fresh khat, while growing, contains both cathine and cathinone; that the ratio of cathine to cathinone in growing khat is between three and four to one; that within three days after harvest of khat, the cathinone therein rapidly converts to cathine; that no evidence suggests that cathine racemizes, deteriorates, or metabolizes on its own; and that cathine would remain in the khat plant for an extended period of time with no marked reduction. Dr. Kell further averred that he had been informed that Kiddon had testified that he found cathinone but no cathine in a quantity of khat that had been seized approximately one week after harvest and frozen until the time of testing several months later. Based upon his review of scientific literature regarding the khat plant, Dr. Kell concluded that "it is not chemically possible to have a quantity of harvested khat which contains cathinone but which contains no cathine." (Kell affidavit, paragraph 15.) Accordingly, Dr. Kell opined that "a finding of cathinone in a quantity of harvested khat which contained no cathine would indicate mistaken testing methodology." (Kell affidavit, paragraph 16.)

{¶ 37} Defendant contends that Kiddon's testimony regarding his finding that the khat he analyzed contained cathinone but no cathine constituted witness misconduct, at least in the sense that such testimony was "scientifically impossible" and thus, unreliable. Defendant argues that Kiddon "mixed up the standards for cathine and cathinone and in fact found all cathine and no cathinone * * *." (Appellant's brief at 10.) Defendant contends that if, as defendant believes, Kiddon incorrectly performed the chemical analysis, or utilized the

wrong standard in compiling his test results, his actions amounted to misconduct because he held himself out as an expert witness whose testimony was entitled to greater weight based upon his status as an expert.

{¶ 38} Defendant bases this contention on the testimony provided in Dr. Kell's affidavit and similar information contained in the aforementioned HHS report regarding the organic makeup of the khat plant. Specifically, defendant cites evidence that fresh khat contains three to four times as much cathine as cathinone and that the cathinone decomposes into cathine as the khat dries as proof that Kiddon's "no cathine" finding was fatally flawed.

{¶ 39} The court rejected defendant's contention, stating that Dr. Kell's disagreement with Kiddon's methodology, analysis employed, or ultimate opinion "[did] not mean that the state's witness committed misconduct." The court explained:

{¶ 40} " * * * The fact that another expert witness may insist that his or her view of a scientific area is the only scientifically acceptable view is not conclusive. Here, belatedly, the defendant has offered opinion testimony which differs from the opinion testimony given by an expert witness at trial. To accept the view of Dr. Kell and reject the testimony of the state's witness would require the court to find that the non-appearing affiant was somehow more credible than the witness who did appear and did testify at trial. There is no basis for the court to conclude that only Dr. Kell's opinion counts or that Dr. Kells's [sic] view of the correct scientific standard is the only view that is acceptable. He may be correct. He may be incorrect. That he differs with the opinion of the state's witness does not mean the state's witness committed misconduct." (Jan. 29, 2002 decision, at 5.)

{¶ 41} With regard to the HHS report, the court stated:

{¶ 42} "* * * [T]he use of a learned treatise to impeach a witness does not convert that impeaching material into substantive evidence. The only substantive evidence before the court is the testimony of Mr. Kiddon, the state's chemist. The defendant had the opportunity to present his own expert on the subject. He chose not to do so. * * * " Id.

{¶ 43} Initially, we note that defendant cites no authority in support of his allegation that Kiddon's testimony amounted to "misconduct" entitling him to a new trial. Further, we discern no abuse of discretion on the part of the trial court in its finding that defendant was not entitled to a new trial pursuant to Crim.R. 33(A)(2). We first note that defendant was found guilty of possession of cathinone, not cathine. Kiddon's alleged improper finding of "no cathine" does not inherently or necessarily cast doubt on his finding that the khat in defendant's possession contained cathinone. It was not impossible for Kiddon to

legitimately find cathinone but then make a mistake regarding cathine. Kiddon was cross-examined extensively on this issue and, although he admitted being "surprised" in finding no cathine in the khat, he was unwavering in his testimony that he was correct regarding his finding of cathinone. Thus, even if it had been "scientifically impossible" for Kiddon to fail to find cathine, it was not impossible for him to find cathinone. In addition, we note that Dr. Kell's affidavit does not dispute Kiddon's finding that the khat could have contained cathinone. Dr. Kell did not state that cathinone ever completely disappears from khat. Dr. Kell disputes only Kiddon's "no cathine" finding.

{¶ 44} In addition, we agree with the trial court's finding that the mere fact that Kiddon's expert testimony conflicted with that of Dr. Kell and/or the information provided in the HHS study did not connote that Kiddon's testimony constituted witness misconduct. As the trial court noted, each of the experts in this case was entitled to his opinion on the methodology to be employed in analyzing the khat and the conclusions to be drawn from such an analysis. Conflicting testimony, including differing opinions offered by expert witnesses, merely places the credibility of the witnesses in issue. See *State v. Mattison* (1985), 23 Ohio App.3d 10, 15, 23 OBR 43, 490 N.E.2d 926. As the trial court noted, when the opinions of expert witnesses differ on methodology, analysis employed, or ultimate opinion, the trier of fact must determine which expert to believe. The determination of witness credibility and the weight to be accorded to that testimony is solely within the province of the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. In the instant case, the trial court chose to believe Kiddon's testimony and reject that of Dr. Kell. The trial court was clearly entitled to do so, and we decline to substitute our judgment for that of the trial court.

{¶ 45} In addition, the HHS study upon which defendant relies does not constitute substantive evidence that Kiddon's finding of "no cathine" was "scientifically impossible." Prior to the adoption of Evid.R. 706, which became effective July 1, 1998, the use of learned treatises at trial was governed by rules developed under the common law. *Freshwater v. Scheidt* (1999), 86 Ohio St.3d 260, 267, 714 N.E.2d 891. In Ohio, the common-law rule was that "textbooks and other learned treatises are considered hearsay, may not be used as substantive evidence, and are specifically limited to impeachment purposes only." *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 110, 592 N.E.2d 828. Evid.R. 706 codified Ohio's common-law rule allowing the use of learned treatises for the limited purpose of impeachment. *Freshwater,* supra, 86 Ohio St.3d at 267, 714 N.E.2d 891.

{¶ 46} In the instant case, there was no stipulation that the contents of the report were true or accurate. In addition, although Kiddon acknowledged the report as an authoritative source of information regarding the khat plant, the

report does not, as defendant suggests, constitute "scientifically established fact" (appellant's brief at 12), that is, substantive evidence of the organic makeup of the khat plant. The report could only be used for the limited purpose of impeachment. Id. As noted previously, defense counsel attempted to impeach Kiddon's testimony through use of the report. However, Kiddon remained firm in his conviction that his chemical analysis was correct and rejected the suggestion that he misidentified the cathine as cathinone. Further, the report does not definitively state whether cathinone or cathine ever completely disappear from khat.

{¶ 47} Moreover, even if we were to find that Kiddon's testimony constituted "witness misconduct," we could not find that the trial court abused its discretion in denying defendant's motion for new trial. Defendant was well aware of such "misconduct" during the course of the trial. Defense counsel cross-examined Kiddon extensively about the "no cathine" finding. Kiddon's "misconduct" did not materially affect defendant's substantial rights under Crim.R. 33(A)(2) because the "misconduct" occurred in time for defense counsel to oppose Kiddon's testimony. The defense was apparently satisfied that cross-examination of Kiddon, including use of the HHS report to impeach his testimony, was sufficient to counter his testimony on the issue. Further, the trial court took the case under advisement to allow post-trial briefing. The trial court did not render its decision for over three months, yet the defense never sought to reopen its case to call an expert. Given that the defense had ample opportunity to counter Kiddon's "misconduct," we simply cannot find that defendant's substantial rights were materially prejudiced thereby.

{¶ 48} Finally, in our view, defendant waived the issue by failing to object to the alleged "misconduct" during the trial. In *Schmotzer v. Sixt* (1952), 91 Ohio App. 295, 48 O.O. 392, 108 N.E.2d 154, it is stated, at paragraph one of the syllabus, that "[w]here misconduct of a party or his counsel is claimed to have occurred in the presence of the jury * * * the failure to enter an objection thereto at the first available opportunity in open court waives all claims of error by virtue of such claimed misconduct, and it is too late to present such objection for the first time upon the filing of a motion for new trial." Although *Schmotzer* concerned a claim of misconduct of a party or the party's counsel in the presence of the jury, we find the court's statement applicable to a claim of witness misconduct occurring at a trial to the court. Defendant has demonstrated neither an abuse of discretion nor an error materially affecting his substantial rights. Accordingly, the trial court did not err in denying defendant's motion for new trial under Crim.R. 33(A)(2).[3]

---

3. We note for the record that defendant contends in his brief that the trial court should have at least set the motion for an evidentiary hearing. Defendant did not request such a hearing in his motion for new trial; therefore, the issue was waived.

{¶ 49} Defendant next asserts that the trial court abused its discretion in denying his motion for new trial under Crim.R. 33(A)(3). Defendant contends that Kiddon's "no cathine" finding constituted a "surprise" which ordinary prudence could not have guarded against, and the testimony was prejudicial to the defense. In support of his motion, defendant attached the affidavit of Sidney L. Moore, Jr., defendant's lead counsel at trial. Therein, Moore stated that he was aware from reading literature concerning the organic makeup of the khat plant that cathine should be present in the plant and was thus "totally surprised" by Kiddon's testimony that he found cathinone but no cathine in the khat samples. Moore further stated that he "had not known prior to [Kiddon's testimony] about the zero cathine test." (Moore affidavit, paragraph 6.)

{¶ 50} The trial court rejected defendant's claim of surprise, concluding that the law did not guarantee that the defense would know what Kiddon's testimony would be before trial, that the defense could readily infer a "no cathine" finding when Kiddon's lab report, which had been provided to defendant 12 days before trial, failed to mention cathine, and that the defense, being well aware of literature indicating that cathine should be present, could have presented his own expert witness in an attempt to demonstrate that Kiddon's testing was unreliable.

{¶ 51} We find no abuse of discretion in the trial court's refusal to grant defendant's Crim.R. 33(A)(3) motion for new trial. We note that new trials on grounds of surprise "are and should be granted with great caution * * *." *Kroger v. Ryan* (1911), 83 Ohio St. 299, 306, 94 N.E. 428. Upon review of the record, we conclude that defendant has not met his burden of establishing entitlement to a new trial under Crim.R. 33(A)(3); thus, the trial court did not abuse its discretion in denying the motion on grounds of "surprise."

{¶ 52} Initially, we note that much of our discussion on the "misconduct" issue is applicable to the "surprise" issue. Defendant was convicted of possession of cathinone, not cathine. Kiddon's "no cathine" finding did not inherently cast doubt on his finding that the khat contained cathinone. Kiddon could have legitimately found cathinone while being mistaken about cathine. Further, Moore admitted in his affidavit that he cross-examined Kiddon at length about the alleged anomaly. In addition, Moore did not raise the issue of surprise during Kiddon's testimony (or in the three-month period between trial and release of the trial court's decision). As with "misconduct" situations, a trial court acts well within its discretion to deny a post-trial Crim.R. 33(A)(3) motion when, under circumstances such as those herein, defense counsel fails to raise the issue of surprise during trial.

{¶ 53} Further, Kiddon's report was provided to the defense on August 2, 2001, 12 days before trial. In the report, Kiddon stated that he tested the khat samples and found cathinone. The report was silent on cathine. The trial court

concluded that Moore could not have been surprised by Kiddon's testimony because, given that defendant was originally charged with possession of both cathinone and cathine, Moore (who admitted familiarity with the organic makeup of the khat plant), in ordinary prudence, could have anticipated that there might have been a problem with Kiddon's findings. Defendant points to Moore's affidavit testimony wherein he stated that he believed that Kiddon's failure to mention cathine in the report was due to the prosecution's decision to stop testing for cathine after finding cathinone so as to avoid potential double jeopardy arguments if convicted on both and that he did not learn of the "no cathine" finding until trial, as proof that he was unaware that Kiddon's testimony might prove problematic until he was confronted with the testimony at trial. Moore's affidavit was before the trial court when it ruled on the motion for new trial. As with any testimony, the trial court was free to believe or disbelieve any or all of Moore's testimony. In the instant case, it is entirely possible that the trial court disbelieved Moore's testimony on this issue. Such is the purview of the trial court. *DeHass*, supra.

{¶ 54} Finally, as noted by the trial court, the law does not guarantee that a party will know what the testimony of an individual will be before trial. *State v. Nahhas* (Mar. 16, 2001), Trumbull App. No. 99-T-0179, 2001 WL 277005, citing *State v. LaMar* (Aug. 13, 1998), Lawrence App. No. 95CA31, 1998 WL 514548. Defendant argues that this proposition of law does not apply to a case like this one, where defense counsel was "surprised" by an expert witness testifying "to test results that are a scientific impossibility." (Appellant's brief at 13.) However, as noted previously, defendant failed to establish at trial that Kiddon's testimony was "scientifically impossible."

{¶ 55} Defendant next contends that he is entitled to a new trial under Crim.R. 33(A)(1). Specifically, defendant maintains that the trial court abused its discretion in accepting Kiddon's testimony when, in defendant's view, that testimony was not credible. This argument basically repackages defendant's contention that the trial court should have accepted defendant's impeachment material and Dr. Kell's testimony, rather than the testimony of Kiddon. As we have previously observed, impeachment material may not be considered as substantive evidence. Further, the trial court was free to accept Kiddon's testimony and reject that of Dr. Kell. Indeed, the trial court noted in its decision denying the motion for new trial that it found Kiddon's testimony credible and that it was not required to, and did not, accept the views espoused by Dr. Kell. Having found Kiddon's testimony credible, there was sufficient evidence to support the prosecution's contention that the khat possessed by defendant contained cathinone.

{¶ 56} Defendant also asserted in his motion for new trial that the Ohio General Assembly should not be deemed to have prohibited the possession of the khat plant because the plant is not listed as a controlled substance in the statutes and controlled substance schedules and only its chemical components, specifically, cathinone and cathine, are listed as such. Defendant also claimed that the listing of cathinone as a controlled substance is insufficient to place a person of ordinary intelligence on notice that the possession of khat is prohibited. The trial court rejected defendant's contentions. These arguments are also the subject of defendant's third assignment of error.

{¶ 57} Ohio law prohibits the knowing possession of a controlled substance. R.C. 2925.11. R.C. 3719.41, Ohio's schedule of controlled substances, places within Schedule I "any material, compound, mixture, or preparation that contains any quantity of the following substances * * * " and then lists cathinone as one of the prohibited substances. R.C. 3719.41, Schedule I, (E)(2). R.C. 3719.41, however, does not expressly prohibit the possession of khat.

{¶ 58} We first note, as did the trial court, that the importation of khat into the United States is a fairly recent occurrence. Accordingly, there is a paucity of case law that discusses khat as a controlled substance. Indeed, we have found no Ohio case law on point. Since the issues before us are those of first impression, we turn to the law of other jurisdictions for guidance.

{¶ 59} In *State v. Gurreh* (2000), 60 Conn.App. 166, 758 A.2d 877, a case factually very similar to the one before us, the court found that Gurreh knowingly possessed the controlled substance contained in the khat plant. Therein, Gurreh, a native of Somalia, falsely identified himself as the addressee and accepted a package which contained 31 pounds of khat leaves. Upon acceptance of the package, Gurreh was arrested and charged with possession of a controlled substance. The statute under which Gurreh was charged, Connecticut General Statutes 21a–277(b), prohibited the possession of "any controlled substance." Id. at 881. The relevant portion of Section 21a–243–7(e) of the Regulations of Connecticut State Agencies provided that a "controlled substance" was "*any* material, compound, mixture or preparation which contains any quantity of the following substances having a stimulant effect on the central nervous system * * * (3) Cathinone * * *." (Emphasis sic.) Id. The khat plant was not contained in the list of controlled substances. Defendant argued that the Connecticut legislature could not have intended to prohibit possession of the khat plant because the plant itself was not listed as a controlled substance and only its chemical components, cathine and cathinone, were listed as such. Gurreh argued that because the regulations, in other instances, individually listed both the names of the plants that were considered prohibited substances and the chemical components contained within those plants, the khat plant was not intended to be

prohibited because it was not listed individually.[4] Furthermore, Gurreh pointed to several controlled substances that may be derived from plant or animal sources, the possession of which, like khat, he claimed, was "obviously" not intended to be prohibited.[5] Id. at 880.

{¶ 60} The court rejected Gurreh's argument. In particular, the court noted that under Connecticut law, "[t]he purpose of statutory construction is to give effect to the intended purpose of the legislature * * *. If the language of a statute is plain and unambiguous, we need look no further than the words actually used because we assume that the language expresses the legislature's intent." Id. at 881. Upon review of the relevant language of the statute and regulation under which Gurreh was charged, the court found the wording to be "plain and unambiguous." Indeed, with regard to Section 21a–243–7(e), the court concluded that "[c]learly, the language 'any material' is intended to include those materials that are not specifically listed, but that contain the controlled substances subsequently listed, in this case, cathinone." Id. Accordingly, the court concluded that "the legislature intended to prohibit the possession or sale of khat." Id.

{¶ 61} We find *Gurreh* particularly persuasive in that defendant raises the same arguments as those raised in *Gurreh*. In addition, Ohio's law of statutory construction is similar to that of Connecticut. "The polestar of statutory interpretation is legislative intent, which a court best gleans from the words the General Assembly used and the purpose it sought to accomplish * * *." *State v. Hanning* (2000), 89 Ohio St.3d 86, 91, 728 N.E.2d 1059. The primary goal in statutory interpretation is to "give effect to the intent of the legislature." *Christe v. GMS Mgt. Co., Inc.* (2000), 88 Ohio St.3d 376, 377, 726 N.E.2d 497. Applying these principles to the clear and unambiguous language of R.C. 2925.11 and 3719.41, this court concludes, as did the *Gurreh* court, that the language "any

---

4. Gurreh asserted the following regarding the listing of controlled substances including plants and their chemical components: "Not only is 'tetrahydrocannabinols' listed, but 'marijuana' from which it is derived is also listed by name. Not only is 'psilocin' listed, but the psilocybin mushroom from which it is derived is also listed. Not only is 'mescaline' listed, but the 'peyote cactus' from which it is derived is also listed. Not only is 'opium' listed but 'opium poppy' and 'poppy straw' and 'concentrate of poppy straw' are listed. Not only is cocaine prohibited, but 'coca leaves' are also specifically prohibited." Id. at 880, 758 A.2d 877.

5. Gurreh asserted the following: "* * * [W]hile lysergic acid (LSD) is a controlled substance, rye grass can contain a fungus from which LSD may be derived and it is not listed as a controlled substance. LSD may also be derived from the seeds of the common morning glory plant, yet those seeds are not listed as a controlled substance. Furthermore, he asserts that poppy seeds contain 'molecules of opium,' yet they are not listed as a controlled substance. He also lists testosterone, which may be found naturally in animals and humans. Finally, he points out that belladonna alkaloids are controlled substances, but may be found in jimpson [sic, jimson] weed, which grows wild in hog pens." Id.

material" is intended to include the khat plant because that plant contains a specifically enumerated controlled substance—in this case, cathinone.

{¶ 62} Turning to defendant's "fair warning" argument, we proceed from the well-recognized jurisprudential principle that all legislative enactments enjoy a presumption of validity and constitutionality. *Adamsky v. Buckeye Local School Dist.* (1995), 73 Ohio St.3d 360, 361, 653 N.E.2d 212. A statute can be declared invalid only when its unconstitutionality is shown beyond a reasonable doubt. *Cincinnati School Dist. Bd. of, 12 O.O.3d 327 Edn. v. Walter* (1979), 58 Ohio St.2d 368, 376, 390 N.E.2d 813.

{¶ 63} The Due Process Clause of the Fifth Amendment to the United States Constitution requires that the law give a person of ordinary intelligence fair warning that his specific contemplated conduct is forbidden, so that he may conduct himself accordingly. *United States v. Harriss* (1954), 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989. Similarly, "[v]agueness may invalidate a criminal law for either of two independent reasons. First it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Chicago v. Morales* (1999), 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67.

{¶ 64} The *Gurreh* court rejected the same "fair warning" argument raised by defendant. Gurreh maintained that he was not afforded constitutionally adequate notice that the Connecticut statute prohibiting the possession of a controlled substance included the possession of khat because the statutes and regulations listed only cathinone and cathine, and not khat, as controlled substances. Gurreh argued that the statute failed "to define the offense with sufficient definiteness to enable ordinary people to understand what conduct is prohibited * * *." Id. at 883. The court rejected Gurreh's claim. The court first pointed to its decision that the challenged statute and relevant regulations were not ambiguous. The court then considered several "facts and circumstances" in the case. In particular, the court determined that an ordinary person concerned with determining the legality of possession of khat could consult a dictionary and learn that khat is a "habituating stimulant." Id. The court further noted that Gurreh, a native of Somalia, "was already aware of the stimulant characteristic of the substance because of its widespread use" in Somalia. Id. Finally, the court averred that Gurreh's use of an assumed name to accept the package of khat indicated consciousness of guilt.

{¶ 65} A similar conclusion was reached in *United States v. Hussein* (D.Me. 2002), 230 F.Supp.2d 109. Therein, Hussein picked up a parcel containing khat at a FedEx office, using only the tracking number that had been given to him by a

friend. Neither the friend's name nor Hussein's name was listed on the parcel, and the label falsely listed the contents as documents. Chemical testing of a sample of the khat revealed the presence of cathinone. Hussein knew that the parcel contained khat; however, no evidence suggested that he knew that khat contained cathinone or that he knew what cathinone was. The indictment charged that Hussein "unlawfully, knowingly and intentionally possessed with intent to distribute a substance containing Cathinone, a Schedule I controlled substance * * *." Id., citing Section 841(a), Title 21, U.S.Code. The court determined from the above-noted evidence that a jury could find beyond a reasonable doubt that the government had established the "scienter" requirement set forth in Section 841(a), Title 21, U.S.Code, because Hussein knew that the substance he possessed was khat and had taken steps to avoid detection by law enforcement officials. Id. at 112.

{¶ 66} Hussein raised the same "fair warning" argument raised by defendant. In addressing the issue, the court noted that khat was not listed as a controlled substance, but the chemical components of khat, cathine and cathinone, were listed in Schedule IV and I, respectively. The court concluded that Hussein was afforded adequate notice that his actions were criminal. The court explained:

{¶ 67} "On the subject of whether a law provides adequate notice that certain behavior is criminal, the Supreme Court has said that the question is whether 'reasonable persons would know that their conduct is at risk.' * * * A 'scienter' requirement in the statute, like the requirement in this statute that a defendant knows that he has a controlled substance, reduces notice concerns. * * * Moreover, in this Circuit a defense of ignorance of the law, the notice argument, is limited to 'wholly passive' conduct, and the First Circuit has ruled that possession of a firearm is not 'passive.' * * * If possession of a firearm is not 'passive,' then neither is possession of khat. That ends the adequacy of notice argument under existing precedent. * * *." (Footnotes containing citations omitted.) Id. at 113–114.

{¶ 68} The "facts and circumstances" of the case sub judice are strikingly similar to those found in *Gurreh* and *Hussein*. The evidence here demonstrates that the shipment of khat was sent to a fictitious address from Great Britain. Defendant, who was not the addressee, arrived to pick up the shipment with the control number written on a napkin. Even though he was not the addressee, he signed the fictitious addressee's name, "John Goodman" and took possession of the package. The purported shipper, "Hogg & Sons," filed a false invoice for the package listing the contents as "wiring equipment." The package and waybill falsely listed the contents as "wiring equipment." Defendant admits that he went to pick up khat for a wedding. Defendant is a native of Somalia and knew that khat is purchased and used by the Somali people.

{¶ 69} As did the *Gurreh* court, we find that if defendant was concerned with determining the legality of possessing khat, he could have consulted a dictionary or other source to determine the meaning of the word. Further, as the state suggests, he could have called an attorney or some other source to inquire whether khat was legal in Ohio. Moreover, although defendant denied at trial that he knew of the stimulant characteristics of khat, the subterfuges and clandestine actions noted above indicate that defendant knew that possession of khat was illegal and that he took steps to avoid detection. Further, as in *Hussein*, the statute under which defendant was convicted contains a scienter requirement, thereby reducing notice concerns.

{¶ 70} Finally, defendant contends that the trial court erred in denying his motion for new trial on grounds that the sentence imposed upon him was not applicable to the facts of the case. Specifically, defendant contends that the state failed to prove beyond a reasonable doubt that he possessed cathinone in a quantity equal to or exceeding 100 times the bulk amount. Defendant raises the same arguments in his fifth assignment of error.

{¶ 71} This court adopts the well-reasoned conclusion of the trial court:

{¶ 72} "The defendant was charged with possession of drugs, R.C. 2925.11, in that he knowingly possessed a controlled substance. The penalty for knowing possession of a controlled substance depends upon the type and amount of the controlled substance possessed. Thus, pursuant to R.C. 2925.11(C)(1)(e):

{¶ 73} " '[I]f the drug involved * * * is a compound, mixture, preparation or substance included in schedule * * * (and if) * * * the amount of the drug involved exceeds one hundred times the bulk amount, aggravated possession of drugs is a felony of the first degree, and the court shall impose as a mandatory prison term the maximum prison term prescribed for a felony of the first degree * * *.'

{¶ 74} " 'Bulk Amount' of a controlled substance is defined in R.C. 2925.01(D). The term 'bulk amount' applies to the gross amount of ' * * * any compound, mixture, preparation or substance * * *' not merely the specific chemical compound in its purest form. Thus, in the case of a Schedule I stimulant (the instant case), bulk amount is:

{¶ 75} " 'An amount equal to or exceeding thirty grams or ten unit doses of a compound, mixture, preparation, or substance that is or contains any amount of a schedule I * * * stimulant * * *' R.C. 2925.01(D)(1)(c).

{¶ 76} "The defendant argues that plant material, (khat), does not fall within the words 'compound, mixture, preparation or substance' and therefore, he is guilty of at most, simple possession, a felony of the fifth degree.

{¶ 77} "From a review of the foregoing statutes, it is clear that the legislature intended to prohibit the possession of any amount of a controlled substance, whether the substance occurs in its purest state or when mixed with or contained in another form. While vegetation may not readily fall within the definition of the words compound, mixture or preparation, vegetation does fall within the common definition of substance. Substance is defined in the Oxford Dictionary as follows: 'substance/n. 1a. the essential material * * *.' Here the 'essential material' is the vegetation containing cathinone. Therefore, the entire amount is included to determine the quantity involved and the penalty to be imposed." (Jan. 29, 2002 decision, at 11–13; footnotes omitted.)

{¶ 78} Defendant attempts to draw a distinction between the use of the word "material" in the Schedule I list and the word "substance" in the definition of "bulk amount." As noted by the trial court, however, defendant's argument is flawed. Defendant assumes that khat can qualify as "any material * * * that contains any quantity" of cathinone for purposes of Schedule I. Even though khat would thereby qualify as a Schedule I "material," defendant contends that khat would not be included in the "bulk amount" definition for Schedule I stimulants, since the "bulk amount" definition refers, without reference to "material," to "[a]n amount * * * of a compound, mixture, preparation, or substance that is or contains any amount of * * * a schedule I stimulant." However, as the trial court recognized, "material" is one way of defining "substance," and so "material" and "substance" are substantially equivalent.

{¶ 79} The state contends, and we agree, that defendant's argument would create an absurd result. It assumes that khat is banned as a Schedule I "material" but that no "bulk amount" has been established. The "bulk amount" definitions support the view that the General Assembly meant to provide an exhaustive list for "bulk amounts" for each drug schedule. The General Assembly would not have banned khat/cathinone under Schedule I and then not provide an appropriate "bulk amount" by which to prosecute the most egregious offenses. The schedules and "bulk amount" definitions were meant to work together.

{¶ 80} Defendant also contends that the state failed sufficiently to prove that he possessed an amount of cathinone equal to or exceeding the bulk amount because Kiddon tested only a sample of the seized khat and did not test each individual stem.

{¶ 81} The random-sampling method of testing has been upheld by several courts, including this one. *State v. Smith* (Dec. 23, 1997), Franklin App. No. 97APA05–660, 1997 WL 798301; *State v. Rose* (2001), 144 Ohio App.3d 58, 759 N.E.2d 460; *State v. Mattox* (Nov. 18, 1983), 13 Ohio App.3d 52, 13 OBR 55, 468 N.E.2d 353; *In re Lemons* (1991), 77 Ohio App.3d 691, 603 N.E.2d 315; *State v. Smith* (Oct. 4, 1990), Cuyahoga App. No. 57572, 1990 WL 145618. These cases

hold that the random-sampling method of testing creates a reasonable inference that all similar contraband contains the same controlled substance as that tested, at least when the contraband is recovered together and similarly packaged. Accordingly, evidence of the random-sampling method is sufficient as a matter of law to support a determination that the entire substance recovered together and similarly packaged is the same controlled substance as that tested. See *Smith,* supra.

{¶ 82} In the instant case, evidence was introduced at trial sufficient to support the inference that all of the khat seized contained cathinone. As noted above, Kiddon testified that the package seized from defendant contained two smaller boxes, each of which contained 85 bundles of khat. He weighed the contents of each box separately. He then performed tests on a total of 20 random samplings taken from the boxes. Kiddon testified that he chopped each sample into small pieces and ground the pieces together. All 20 tests indicated the presence of cathinone. Kiddon further testified that the gross weight of the first box was 13,853 grams and the gross weight of the second box was 14,292 grams. Thus, the total gross weight of the seized khat was 28,145 grams, more than 100 times the bulk amount for a Schedule I stimulant at the time the offense was committed. See R.C. 2925.01(D)(1)(c) (establishing bulk amount of a Schedule I stimulant as 30 grams). Accordingly, the evidence presented at trial was sufficient to support the trial court's determination that defendant possessed more than 100 times the bulk amount of cathinone.

{¶ 83} For the foregoing reasons, defendant's first, third, and fifth assignments of error are not well taken.

{¶ 84} By his second assignment of error, defendant contends that he was denied the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Section 11, Article VIII of the Ohio Constitution. In particular, defendant maintains that defense counsel was ineffective in failing to interview Kiddon before trial, in failing to present substantive evidence on the organic makeup of khat via an expert witness, and in failing to request a continuance after Kiddon's "no cathine" testimony.

{¶ 85} In *State v. Johnson* (May 30, 2000), Franklin App. No. 99AP–753 and 99AP–754, this court explained the applicable standard for addressing a claim of ineffective assistance of counsel:

{¶ 86} "In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-prong test enunciated in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Initially, defendant must show that counsel's performance was deficient. To meet that requirement, defendant must show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Defendant

may prove counsel's conduct was deficient by identifying acts or omissions that were not the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690 [104 S.Ct. 2052, 80 L.Ed.2d 674].

{¶ 87} "Next, if defendant successfully proves that counsel's assistance was ineffective, the second prong of the *Strickland* test requires defendant to prove prejudice in order to prevail. Id. at 692 [104 S.Ct. 2052, 80 L.Ed.2d 674]. To meet that prong, defendant must show counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable. Id. at 687 [104 S.Ct. 2052, 80 L.Ed.2d 674]. See, also, *State v. Underdown* (1997), 124 Ohio App.3d 675, 679, 707 N.E.2d 519. A defendant meets the standard with a showing 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id. at 694 [104 S.Ct. 2052, 80 L.Ed.2d 674]."

{¶ 88} A properly licensed attorney is presumed competent. *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 301, 31 O.O.2d 567, 209 N.E.2d 164. Moreover, there is " 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *.' " *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373, quoting *Strickland* at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Additionally, the effective assistance of counsel does not guarantee results. *State v. Longo* (1982), 4 Ohio App.3d 136, 139, 4 OBR 228, 446 N.E.2d 1145. "A failure to prevail at trial does not grant an appellant license to appeal the professional judgment and tactics of his trial attorney." *State v. Hart* (1988), 57 Ohio App.3d 4, 10, 566 N.E.2d 174. Moreover, reviewing courts must not use hindsight to second-guess trial strategy, and must keep in mind that different trial counsel will often defend the same case in different manners. See *Strickland* at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 89} Defendant first asserts that because defense counsel had Kiddon's report 12 days prior to trial, he should have called Kiddon before trial and questioned him about the report. Reasonable trial tactics can explain defense counsel's failure to interview the state's expert witness before trial. Pretrial questioning of Kiddon could have alerted him to particular lines of inquiry, thereby allowing Kiddon to prepare further and/or rob defense counsel's cross-examination of some of its force. In addition, defense counsel has admitted familiarity with the organic makeup of khat and, under the circumstances, could have reasonably anticipated that he would be fully prepared to handle all conceivable eventualities in Kiddon's testimony. Although defense counsel has asserted in his affidavit that he was "totally surprised" by Kiddon's testimony,

nothing in that affidavit precludes the notion that defense counsel may have had reasonable grounds for not interviewing Kiddon before trial. Indeed, defense counsel does not admit that he should have interviewed Kiddon prior to trial. Even if hindsight suggests that defense counsel should have interviewed Kiddon, we have already noted that such hindsight is inappropriate under *Strickland*. Moreover, defense counsel thoroughly cross-examined Kiddon at trial on his "no cathine" finding.

{¶ 90} Defendant next asserts that defense counsel was ineffective in failing to seek a continuance after Kiddon's "no cathine" testimony and call an expert witness such as Dr. Kell. Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if a better strategy had been available. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643. The decision whether to call a witness is generally a matter of trial strategy and, absent a showing of prejudice, does not deprive a defendant of effective assistance of counsel. *State v. Williams* (1991), 74 Ohio App.3d 686, 694, 600 N.E.2d 298. Further, the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel. *State v. Hartman* (2001), 93 Ohio St.3d 274, 299, 754 N.E.2d 1150. In fact, in many criminal cases trial counsel's decision not to seek expert testimony "is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant." *State v. Glover*, Clermont App. No. CA2001–12–102, 2002-Ohio-6392, 2002 WL 31647905, at ¶ 95. "Further, even if the wisdom of such an approach is debatable, 'debatable trial tactics' do not constitute ineffective assistance of counsel." Id., quoting *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189.

{¶ 91} As we have already mentioned, defense counsel effectively cross-examined Kiddon at trial. Further, Dr. Kell's affidavit was before the trial court on defendant's motion for new trial. Accordingly, the trial court was aware of what Dr. Kell would have testified to at trial. Even after review of Dr. Kell's affidavit testimony, the trial court continued to find Kiddon's testimony credible.

{¶ 92} Because it appears that defendant cannot establish that trial counsel's decision not to interview Kiddon before trial or to seek a continuance for the purpose of calling an expert witness was anything more than sound trial strategy, the issue of whether trial counsel's decision prejudiced defendant's defense need not be considered. See *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52 ("A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other."). We thus reject defendant's claims of ineffective assistance of trial counsel. Accordingly, defendant's second assignment of error is not well taken.

{¶ 93} In his fourth and seventh assignments of error, defendant challenges his conviction as being against the sufficiency and manifest weight of the evidence.

{¶ 94} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, paragraph two of the syllabus. We begin by addressing defendant's sufficiency arguments. In reviewing a claim that a criminal conviction is against the sufficiency of the evidence, an appellate court must determine whether the evidence presented at trial, viewed in a light most favorable to the prosecution, would allow a rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. In other words:

{¶ 95} "A challenge to the sufficiency of evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. * * *" *Thompkins,* supra, 78 Ohio St.3d at 390, 678 N.E.2d 541 (Cook, J., concurring).

{¶ 96} Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. at 386, 678 N.E.2d 541.

{¶ 97} R.C. 2925.11(A) provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance." The evidence at trial established that defendant took possession of over 28,000 grams of khat. The state's expert, Kiddon, testified that the khat contained cathinone. R.C. 3719.41 provides that cathinone is a Schedule I controlled substance. Under his sufficiency argument presented in his fourth assignment of error, defendant does not contend that he did not knowingly possess khat and/or cathinone, nor does he argue that cathinone is not a controlled substance. Rather, defendant contends only that Kiddon's testimony that the khat contained cathinone was not credible. In support of his contention, defendant cites the testimony provided in Dr. Kell's affidavit and the information contained in the HHS report. As noted previously, in reviewing sufficiency of the evidence, this court does not assess the credibility of witnesses. See *Jenks,* supra; *Thompkins,* supra. Kiddon's testimony that the khat seized from defendant contained cathinone was sufficient for a rational trier of fact to conclude that defendant possessed a controlled substance.

{¶ 98} Defendant raises an additional sufficiency argument in his seventh assignment of error. Specifically, defendant maintains that the evidence at trial was insufficient to support his conviction because the state failed to offer any

proof that the quantity of cathinone possessed by defendant was sufficient to have a stimulant effect on the central nervous system. It is undisputed that the state offered no such proof; however, the state argues that the statute imposes no such requirement. The question resolves, then, to one of statutory construction.

{¶ 99} The interpretation of a statute is a question of law subject to de novo review. *Neiman v. Donofrio* (1992), 86 Ohio App.3d 1, 3, 619 N.E.2d 1117. "In construing a statute, a court's paramount concern is the legislative intent in enacting the statute." *State v. S.R.* (1992), 63 Ohio St.3d 590, 594, 589 N.E.2d 1319. To determine the legislative intent, a court must look to the language of the statute. *Provident Bank v. Wood* (1973), 36 Ohio St.2d 101, 104, 65 O.O.2d 296, 304 N.E.2d 378. Words used in a statute are to be taken in their usual, normal, and customary meaning. *State ex rel. Pennington v. Gundler* (1996), 75 Ohio St.3d 171, 173, 661 N.E.2d 1049. Further, unless a statute is ambiguous, the court must give effect to the plain meaning of a statute. Id. When a court must interpret a criminal statute, which defines offenses or penalties, the language should be strictly construed against the state and liberally construed in favor of the accused. R.C. 2901.04(A); *State v. Hill* (1994), 70 Ohio St.3d 25, 31, 635 N.E.2d 1248. However, a court's interpretation should not be unduly technical, arbitrary, severe, artificial, or narrow. *State v. Brown* (App.1960), 85 Ohio Law Abs. 85, 170 N.E.2d 854.

{¶ 100} A person may be found guilty of aggravated possession of drugs "[i]f the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule I * * *." R.C. 2925.11(C)(1). Cathinone is listed as a Schedule I drug:

{¶ 101} "(E) Stimulants

{¶ 102} "Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation that contains any quantity of the following substances *having a stimulant effect on the central nervous system,* including their salts, isomers, and salts of isomers:

{¶ 103} "* * *

{¶ 104} "(2) Cathinone. * * *" (Emphasis added.) R.C. 3719.41 Schedule I, (E)(2).

{¶ 105} Ohio's schedule of controlled substances classifies a number of different substances using phrases like the one at issue here. For example, R.C. 3719.41, Schedule I(D), Schedule II(D), and Schedule III(B) classify various depressants as "[a]ny material, compound, mixture, or preparation that contains any quantity of the following substances *having a depressant effect on the central nervous system.*" (Emphasis added.) R.C. 3719.41 Schedule I(C), Schedule II(C), Schedule III(A), Schedule IV(D), and Schedule V(C) classify various

stimulants as "any material, compound, mixture, or preparation that contains any quantity of the following substances *having a stimulant effect on the central nervous system."* (Emphasis added.) We can find no Ohio decision, nor was any cited to us, which addresses the issue raised by defendant. There is, however, authority from other jurisdictions that is helpful, and certainly reference to decisions of courts in other jurisdictions as a means of interpreting a body of law is an accepted practice. *Ohio Ins. Guar. Assn. v. Simpson* (1981), 1 Ohio App.3d 112, 113, 1 OBR 418, 439 N.E.2d 1257.

{¶ 106} Defendant relies on *Commonwealth v. Teada* (1975), 235 Pa.Super. 438, 344 A.2d 682, in support of his argument that the phrase "having a stimulant effect" adds an element that must be proven by the state. In *Teada,* the court interpreted a statute which included in the class of Schedule III controlled substances "[a]ny material, compound, mixture, or preparation unless specifically excepted or unless listed in another schedule which contains any quantity of the following substances having a potential for abuse associated with a depressant effect on the central nervous system * * *." Id. at 683. The court held that the phrase "having a potential for abuse associated with a depressant effect" modified the word "quantity"; thus, the state was required to prove that the quantity of the controlled substance possessed was sufficient to have a depressant effect on the central nervous system. In so holding, the court reasoned that the statutory scheme evinced the legislature's intent to impose greater restrictions on the more dangerous substances and greater proof requirements on the prosecution as the criminal inquiry moved from the most dangerous substances to the least dangerous ones. Id. at 684. The court also concluded that its interpretation prevented the phrase from being mere surplusage. Id. This reasoning has, however, been uniformly rejected by courts in other jurisdictions.

{¶ 107} Indeed, most jurisdictions faced with a similar interpretation question have concluded that the government is not required to prove that the quantity of the drug in question had a stimulant or depressant effect. See, for example, *United States v. Durham* (C.A.9, 1991), 941 F.2d 886; *United States v. Picklesimer* (C.A.3, 1978), 585 F.2d 1199; *United States v. White* (C.A.7, 1977), 560 F.2d 787; *United States v. Nickles* (C.A.5, 1975), 509 F.2d 810; *State v. Light* (App.1993), 175 Ariz. 62, 852 P.2d 1246; *State v. Hernandez* (App.1986), 104 N.M. 97, 717 P.2d 73; *State v. Ali* (Minn.App.2000), 613 N.W.2d 796; *State v. Collinsworth* (1975), 96 Idaho 910, 539 P.2d 263; *People v. Moran* (Colo.App. 1999), 983 P.2d 143.

{¶ 108} Several of these jurisdictions have determined that phrases such as the one at issue here are intended to guide the legislature in classifying and categorizing new controlled substances and are not an element required to be proven by the government. See, e.g., *Picklesimer,* supra, 585 F.2d at 1203;

*Moran,* supra, 983 P.2d at 147; *Collinsworth,* supra, 539 P.2d at 267. Likewise, courts have determined that such phrases represent a legislative determination that the controlled substance at issue actually had actual depressive or stimulant effects; thus, further proof is not required. See, e.g., *White,* supra, 560 F.2d at 780–790; *Nickles,* supra, 509 F.2d at 811; *Light,* supra, 852 P.2d at 1247. In addition, several courts have determined that the placement of the challenged phrase near the word "substance" rather than the word "quantity" supports the construction urged by the state here, i.e., that proof of any quantity of the controlled substance would satisfy the requirements of the statute. See *Hernandez,* supra, 717 P.2d at 76 (adopting this view and citing other jurisdictions that have adopted similar rationale).

{¶ 109} We find the reasoning in these cases to be persuasive, as Ohio's statute is similarly phrased. The aforementioned federal cases are a particularly valid source of guidance for this court, since the Ohio controlled-substances statutes parallel those of the federal equivalent and are worded to ensure that Ohio law evolves in step with federal provisions. *State v. Klinck* (1989), 44 Ohio St.3d 108, 541 N.E.2d 590. Thus, we conclude that the phrases "having a stimulant effect" or "having a depressant effect" were intended to provide guidance to the Ohio General Assembly in classifying and categorizing new controlled substances and/or evinces the General Assembly's determination of the actual stimulant or depressant effect of the specifically listed substances, including cathinone. In addition, as noted by the court in *Ali,* such an interpretation is supported by practical reasons—"As with other substances, the effect of a given amount of cathinone depends on the amount of cathinone already consumed, other substances consumed by a person, the person's sensitivity to cathinone, and the person's size. Thus, the interpretation advocated by defendants would necessarily result in inconsistent and irregular prosecutions." Id. at 799. In short, we hold that the state was not required to prove that cathinone was present in a quantity sufficient to have a stimulant effect on the central nervous system in order to support the conviction for possession of cathinone, a controlled substance.

 {¶ 110} Having found sufficient evidence to support defendant's conviction, we turn to his manifest weight claim. "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court of appeals may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins,* supra, 78 Ohio St.3d at 387, 678 N.E.2d 541. As noted previously, a challenge to the weight of the evidence is analytically distinct from a challenge to the sufficiency of the evidence.

 {¶ 111} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court reviews the record, weighs the evidence

and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. The reviewing court should consider whether the evidence is credible or incredible, reliable or unreliable, certain or uncertain, conflicting, fragmentary, whether a witness was impeached and whether a witness had an interest in testifying. *State v. Mattison* (1985), 23 Ohio App.3d 10, 14, 23 OBR 43, 490 N.E.2d 926. The credibility of witnesses is primarily an issue for the trier of fact who observed the witnesses in person. *DeHass,* supra.

{¶ 112} After reviewing the record and weighing the evidence presented, we conclude that the evidence against defendant is sufficiently credible to support his conviction. Even though defendant disputed Kiddon's "no cathine" finding through use of Dr. Kell's affidavit and the HHS study, such is not enough to require reversal on manifest weight grounds. In *State v. Craig* (Mar. 23, 2000), Franklin App. No. 99AP–739, 2000 WL 297252, this court stated:

{¶ 113} "As this court has previously stated, '[w]hile the [factfinder] may take note of the inconsistencies and resolve or discount them accordingly, see [*State v.*] *DeHass* [ (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212], such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' *State v. Nivens* (May 28, 1996), Franklin App. No. 95APA09–1236 [1996 WL 284714]. It was within the province of the [factfinder] to make the credibility decisions in this case. See *State v. Lakes* (1964), 120 Ohio App. 213, 217 [29 O.O.2d 12], 201 N.E.2d 809 ('[i]t is the province of the [factfinder] to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness'). See *State v. Harris* (1991), 73 Ohio App.3d 57, 63, 596 N.E.2d 563 (even though there was reason to doubt the credibility of the prosecution's chief witness, he was not so unbelievable as to render the verdict against the manifest weight)."

{¶ 114} The trial court afforded little (if any) weight to the testimony provided in Dr. Kell's affidavit. The trial court noted that it was in no way bound to believe the opinion of Dr. Kell. Further, the trial court stated in its decision denying the motion for new trial that it believed Kiddon's testimony at trial and continued to believe it even in light of Dr. Kell's affidavit testimony. With regard to the HHS report, the trial court noted that it was only in evidence at trial for the nonsubstantive purpose of impeaching Kiddon. Moreover, as stated previously, Kiddon's "no cathine" finding does not necessarily or inherently cast doubt on Kiddon's cathinone finding. For all these reasons, we discern no miscarriage of justice in the trial court's decision to reject defendant's claim. There is no

evidence that the trial court lost its way or created a manifest miscarriage of justice. Consequently, we cannot say that defendant's conviction is against the manifest weight of the evidence. Defendant's fourth and seventh assignments of error are not well taken.

{¶ 115} In his sixth assignment of error, defendant contends that the controlled substances statutory scheme under which he was sentenced to a mandatory minimum of ten years' imprisonment constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Section 9, Article I of the Ohio Constitution.[6] The question of the constitutionality of a statute must generally be raised in the trial court. *State v.1981 Dodge Ram Van* (1988), 36 Ohio St.3d 168, 170, 522 N.E.2d 524. The record reveals that defendant did not raise the constitutionality of the statutory scheme at the trial court level. Indeed, the trial court noted in its decision overruling the motion for new trial that "no Eighth Amendment argument is before the court * * *." (Jan. 29, 2002 decision, at 13, fn. 6.) In *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus, the Ohio Supreme Court held that "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." This rule applies to defendant's claim that the controlled substances statutory scheme is unconstitutional as applied to him. The claim was apparent but yet not made before the trial court. Accordingly, defendant's sixth assignment of error is not well taken.

{¶ 116} For the foregoing reasons, defendant's seven assignments of error are overruled, and the judgments of the Franklin County Court of Common Pleas are hereby affirmed.

Judgments affirmed.

DESHLER and BROWN, JJ., concur.

---

6. Defendant has not asserted a facial challenge to the constitutionality of the statutory scheme. Rather, defendant asserts his constitutional challenge only as applied to him.